THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES V. FAULKNER, Defendant-Appellant.

Fifth District   No. 5—87—0712

Opinion filed August 1, 1989.

Robert H. Rice, of Rice Law Offices, of Belleville, for appellant.

Charles Garnati, State's Attorney, of Marion (Kenneth R. Boyle, Stephen E. Norris, and Raymond F. Buckley, Jr., all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE WELCH delivered the opinion of the court:

Defendant, James V. Faulkner, appeals his September 9, 1987, conviction of murder following a jury trial in the circuit court of Williamson County.

The following evidence was adduced at trial. The defendant's son, also named James Faulkner, and known as Jimmy Faulkner, stated that sometime around July 4, 1984, his mother, father and the victim had gone out drinking together. While they were out socializing, Jimmy and his two sisters stayed home and were in bed before their parents and the victim returned. Sometime after midnight Jimmy heard his parents and the victim talking in his parents' bedroom. After hearing conversation between his father and the victim regarding the victim having had sex with the defendant's wife, the defendant entered Jimmy's room and asked him to accompany him and observe something. At that time, the defendant was holding a knife which was identified by Jimmy during trial. As Jimmy and his father entered the parents' bedroom, Jimmy saw his mother on top of the victim engaging in sexual intercourse.

After entering his parents' bedroom and witnessing his mother on top of the victim, Jimmy saw the defendant push his mother off the victim and stab the victim once in the chest with the knife. The victim fell out of the bed and the defendant dragged the victim into the bathroom and placed him in the bathtub. Jimmy testified that the victim was still alive at that point in time. Defendant then had Jimmy retrieve a baseball bat. After obtaining the baseball bat, the defendant closed the bathroom door and beat the victim with the bat for what Jimmy approximated to be two to three minutes. The defendant and his wife then wrapped the victim's body in a painting canvas and moved the body from the bathtub to the garage, where they placed the body in the trunk of defendant's Ford LTD. When the body was placed in the trunk, Jimmy did not detect any sign of life.

With the victim's body in the trunk of the car, the defendant and his family drove the body from their home in Marion, Illinois, to defendant's mother's home in East St. Louis, Illinois. After an unsuccessful attempt at digging a grave in which to bury the victim's body at an uncertain location down a dirt road near East St. Louis,

the family returned to the defendant's mother's home. The following day, with the victim's body still in the trunk, the family returned to Marion. Once back in the Marion area, the family drove to what the defendant's son Jimmy described as a "strip pit." There, Jimmy, the defendant and his wife removed the victim's body from the trunk of the car and dropped it down an embankment, where it rolled into a tree and stopped. The defendant then piled tires and other trash on top of the body in an attempt to conceal it.

Jimmy testified further that after the family returned to their home, the defendant and his wife scrubbed the bedroom floor. Coconut oil was poured on the carpet and a fan was used in an attempt to dry the oil. Defendant also removed the carpet from the trunk of the car and instructed Jimmy to take the knife with which defendant stabbed the victim and throw it in the Marion reservoir.

Still on direct examination, Jimmy stated that he did not report the incident pertinent herein until approximately three years after its occurrence because he was afraid of his father. He supported this with a claim that, during his freshman year in high school, his father had broken his nose. He also claimed that his love for his father was partly to blame for his hesitation in reporting the killing. After his father was arrested, Jimmy informed the defendant's attorney that he fabricated in its entirety the story implicating his father. He stated that his reason for telling defendant's attorney that his story was false was because his mother was always screaming at him. Although Jimmy felt bad about his father being in jail, he was still uncomfortable about the possibility of his father being released from jail.

On cross-examination, Jimmy stated that he began having problems at home and at school in the summer of 1985. He resorted to running away from home periodically between 1985 and 1987. Again, he admitted to making the confession to defendant's attorney that, as a result of the problem-plagued relationship between he and his father, he had fabricated the story about his father killing the victim. At no time did Jimmy return to defendant's attorney's office and recant the confession.

Within the week preceding trial, the prosecuting attorney and a police officer visited Jimmy at school. During cross-examination, defendant's counsel directed Jimmy's attention to that visit, and asked "[a]t that point in time were you told anything by the States Attorney's Office or by Officer McCoskey?" The State objected, basing its objection on the lack of clarity in the question and the question's failure to be within the scope of cross-examination. The court

sustained the objection, and defendant's counsel did not rephrase the question or otherwise take an alternative approach to eliciting the testimony sought. At the close of cross-examination, Jimmy was asked if he wanted his father to come home, to which he responded that he did not.

The defendant's daughter, Valerie Faulkner, testified that the victim had visited their house a few times. The day of the killing, her mother and father had had an argument. After the argument, her father left the home, and the victim came to the home while her father was away. While the victim was still at their home, her father returned. Shortly thereafter, her mother and father went to a tavern with the victim. While the three were gone, she and her sister went to sleep in the living room, and Jimmy went to sleep in the girls' bedroom. Later that evening, Valerie awoke and heard her father ask the victim if he had slept with anyone besides the defendant's wife. She then heard her father go into the bathroom, then into the kitchen. She stated that she heard her father get into the silverware drawer in the kitchen. Next, she heard her father get Jimmy, and he and Jimmy went to the parents' bedroom where her mother and the victim were. After hearing her brother and father enter the parents' bedroom, she heard her father say "sayonara, Bill," after which she heard her mother begin screaming. Her father then came out of the bedroom and told her and her sister to go into their bedroom where Jimmy had been sleeping.

Once in her bedroom, Valerie heard the victim's body being moved into the bathroom, which was next to her bedroom. She heard some apologies said by the victim and her father, and the sound of running water, but heard no other sounds. Later, her father, mother and brother came into the girls' bedroom. At that time the girls' mother and brother were crying. The defendant told them that he had killed the victim because the victim had been sleeping with their mother. In Valerie's presence, the defendant looked at his wife and screamed "I did it for her!"

After corroborating Jimmy's testimony pertaining to the placement of the victim's body in the trunk of the car and transporting it to East St. Louis, Valerie stated that she was uncertain as to the ultimate destiny of the body. She testified further that she never wanted to tell anyone about the incident because she was scared of her father. She said he had beaten her, his wife, and Jimmy. Moreover, two days before her father was arrested, he told her that he was concerned that Jimmy might inform authorities about the incident. On May 5, 1987, the day before an arrest warrant was issued

for defendant's arrest, Valerie was questioned by authorities. After telling police authorities her story, and after the defendant had been arrested, Valerie's mother took her to the defendant's attorney's office where, according to a plan contrived by her mother and father, she agreed to tell her father's attorney that the story she had previously told authorities was a lie.

On cross-examination, Valerie stated that on the night she told police authorities her version of the incident, the authorities had informed her that her mother could be in trouble and could possibly be charged with crimes if Valerie failed to tell the truth. On further cross-examination, she confessed to having gone to the defendant's attorney's office after the defendant's arrest, accompanied by her mother and brother, and informing the defendant's attorney that the story she told the police authorities was fabricated by her, her mother, and her brother Jimmy.

Judith Faulkner, the defendant's wife, testified that she first met the victim around 1972 in the Menard Penitentiary. She admitted to knowing the victim, but denied being a friend of his, and claimed that she never had a sexual relationship with him. She stated that the victim had only been to the family's home once, and that was in 1984 when he came to pick up a trunk that belonged to him. She testified that the victim was never injured or stabbed while in her home. Seemingly to the contrary, she admitted that on May 5, 1987, she made a statement before a State prosecutor and a police officer indicating that the defendant, her husband, had killed the victim. She claimed, however, that this statement was offered only after she had been threatened by the prosecutor and police officer. According to her testimony, the statement she gave the prosecutor and police officer was the story fabricated by her son. Her statement did match that of her son, with some minor variations.

On cross-examination, Mrs. Faulkner testified that she had not gone back to the prosecutor or police officer to tell them what actually happened because she was confident, based on previous encounters with the police, that they would not believe her. She stated that when she and her son Jimmy made up the story about the defendant killing the victim, the family was full of tension and fear, focused on or initiated primarily by the defendant. The fabrication was presumably an attempt to rid the family of defendant's presence. According to Mrs. Faulkner, the story was based on Jimmy's awareness that the victim was leaving town for good because somebody was after him.

Susan Gregory, a counselor for the Women's Center in Carbon-

dale, Illinois, testified that she had counseled Mrs. Faulkner on several occasions after the State's Attorney's office had referred Mrs. Faulkner for counseling. During their first meeting, Mrs. Faulkner told her that the defendant had killed the victim with a knife while she and the victim were having sexual intercourse.

Officer Wiseman testified that he searched the defendant's home prior to defendant's arrest. While he was investigating the premises, Mrs. Faulkner left voluntarily in response to a request that she report for an interview. As she left, Officer Wiseman heard the defendant say to her: "Just dumb as a doorknob. Don't tell them shit. You don't know shit."

Illinois State police officer James Buckley, who, in addition to being a road patrolman, is a member of the Underwater Search and Recovery Team (USART), testified that he was assigned to recover the knife that the defendant threw into the Marion Reservoir. On the day of the recovery, Jimmy Faulkner was present at the reservoir and supplied information to the USART captain as to where he was standing when he threw the knife, and threw a stone to indicate the vicinity where the knife entered the water. The knife was recovered and identified.

Katie Adams testified that she was a social worker and had had occasion to speak with the defendant, Mrs. Faulkner, and Jimmy Faulkner. She stated that during one conversation with the defendant, he asked her if she had ever worked with a client who had killed someone. She responded that she had worked with clients who had killed someone before, and inquired whether the defendant had killed someone. To this inquiry, he responded that there were certain things that the social worker did not need to know and should not be told. Further, she stated that defendant had told her that he intentionally instilled fear in his family and had beaten his son Jimmy in the past.

Frank Cooper, a crime scene investigator for the Illinois State Police, testified that he examined the bathroom in the defendant's home in search of any blood, tissue or damage to the drain handle control present therein. He did not report any blood or tissue in the bathroom, but did state that the drain handle control was broken off and missing. He also was involved in a search of the bedroom in which the victim was stabbed, wherein the surface of the wooden floor was covered in part with a powder-like residue. The mattress in the bedroom had some red-colored stains on it. Further, red-colored stains were found in the trunk of the defendant's automobile.

Kevin Zeebs, an employee with the Southern Illinois Forensic Science Laboratory specializing in serology, testified that he performed

tests on portions of the mattress from the defendant's bedroom. Although light pink coloration patterns typical of bloodstains were visible on the mattress, the blood tests were negative. The carpeting from defendant's bedroom had no visible bloodstains on it. Tests on the wood flooring did react positive for the presence of blood, although tests specifically intended to determine if the blood was from a human reacted negative. On cross-examination, Mr. Zeebs stated that he was unable to specify that any of the stains were in fact bloodstains.

Francis Emery, the deceased victim's parole agent, testified that on March 23, 1984, she issued the victim a travel permit to go to the East Alton area to seek employment. In May 1984, Ms. Emery received a complaint from the Williamson County State's Attorney's office that the victim had allegedly been hassling a former girl friend. The victim's parole supervision was transferred to the East St. Louis office, which made unsuccessful attempts to locate the victim. On June 14, 1984, a warrant for the victim's arrest was issued for his failure to respond to requests that he report to the parole office.

John McMillen testified that in 1984 the victim lived with him and his father in a home located in Bethalto, Illinois. On May 31, 1984, approximately two months prior to the time of the victim's death, he and the victim began driving from Bethalto, Illinois, to Carbondale, Illinois. While driving towards Carbondale, Mr. McMillen encountered engine problems with his automobile, and a roadside stop was necessary. Mr. McMillen decided to hitchhike back to Bethalto to get some tools, and the victim hitchhiked on to Carbondale. Mr. McMillen stated that, although the victim had many of his personal possessions at McMillen's residence, the victim never returned or contacted him otherwise and had not done so up to the time of trial.

At the initiation of defendant's case at trial, two stipulations were read to the jury. The first was a statement from Jimmy Faulkner made to defendant's attorney on July 9, 1987, to the effect that the statement given to police authorities implicating his father was fabricated. The second stipulation was to the effect that a statement given to police authorities by Valerie Faulkner was her rendition of the story fabricated by her brother Jimmy. According to the stipulated statement, Valerie did not even know the victim and did not know anything about his murder.

Mr. W.L. Caplinger, a co-member of the defendant's bass fishing club, testified on behalf of the defendant. He stated that neither he nor anyone else in the fishing club knew the defendant to be a violent person.

Rock Jordan, a friend of the defendant's for approximately 10 years, stated that he knew the defendant primarily from fishing with him and from being in a citizens band radio club of which the defendant was a member. He testified that the defendant carried a reputation as a very nonviolent person.

The defendant's wife testified on his behalf to state that the knife allegedly used in the killing was purchased by Jimmy, not the defendant. She added that Jimmy collected knives and her husband did not. Following the return of a jury verdict of guilty based on the preceding evidence, defendant filed notice of the present appeal, stating three issues for our consideration.

The first issue we are asked to consider is whether the trial court erred when, during *voir dire*, it inquired of potential jurors whether they might have difficulty in following Illinois law which does not require that the State produce the body of the victim in order to convict the defendant in a homicide trial. This inquiry was made several times throughout *voir dire*. In order to clearly illustrate the trial court's allegedly erroneous inquiries, we consider it helpful to enunciate a sampling of such inquiries in the context in which they were posed to potential jurors. Examples in their respective contexts follow:

## EXAMPLE ONE

"TRIAL COURT: Have you ever served as a juror?

JUROR: No, sir.

TRIAL COURT: Have you or anyone in your family ever been the victim of a crime?

JUROR: No, sir.

TRIAL COURT: Do you have any bias or prejudice against a person simply because he may be charged with a crime?

JUROR: No, sir.

TRIAL COURT: Is there anything about the nature of the charges in this case that would prevent you from rendering a fair and impartial decision?

JUROR: No, sir.

TRIAL COURT: Will you follow the law as the Court states it to be whether you agree with it or not?

JUROR: Yes, sir.

TRIAL COURT: If the Court instructs you it is not necessary for the State to produce a body in this matter to sustain a conviction, will you follow that law or that instruction?

JUROR: Yes.

TRIAL COURT: Also if the Court instructs you that the

defendant is not required to testify in any manner, would you follow that?

JUROR: Yes, sir."

EXAMPLE TWO

"TRIAL COURT: Do you have any quarrel with the concept that the defendant is innocent until proven guilty beyond a reasonable doubt?

JUROR: No.

TRIAL COURT: Do you have any quarrel with the concept the State is not required to produce a body in this case?

JUROR: No.

TRIAL COURT: Have you had any contact or involvement with the Franklin Williamson County Mental Health program?

JUROR: No.

TRIAL COURT: Are you familiar with the Crenshaw Crossing area?

JUROR: I used to go swimming out there. In the same area of the strip pits."

Based on such inquiries, which in most instances closely resemble example two above in both question phrasing and context, defendant contends that the trial court invaded the province of the jury and influenced the jury's ultimate finding. The sole case cited and relied upon by defendant for support of this contention is *People v. Gathings* (1981), 99 Ill. App. 3d 1135, 425 N.E.2d 1313. In *Gathings*, the appellate court found that an instruction given to the jury was fatally defective and reversed the judgment of the trial court entered on the jury's verdict. The instruction found to be fatally defective in *Gathings* was as follows:

"If you feel the evidence showed reckless conduct, select only those forms and sign a guilty or not guilty form as to each defendant.

However, if you feel the evidence showed attempt murder, attempt armed robbery and aggravated battery, select only those forms and sign a guilty or not guilty form as to each defendant on each charge." (*Gathings*, 99 Ill. App. 3d at 1136, 425 N.E.2d at 1315.)

This instruction, argued the defendants, was improperly given because it was tantamount to directing the jury to return a verdict of guilty of some offense. (*Gathings*, 99 Ill. App. 3d at 1137, 425 N.E.2d at 1315.) Any damage done by this instruction, by way of directing a verdict, was exacerbated by the trial court's second reference to this instruction in response to a written question directed to

the trial court by the jury, after five hours of deliberation, inquiring as to whether the jury could find the defendants guilty of two counts and not guilty on a third count. The reviewing court in *Gathings* agreed with the defendants' argument that the instruction enunciated above required the jury to undergo a step-by-step process which exerted pressure on the jury to convict the defendants because the jury in *Gathings* was required to determine guilt or innocence upon the assumption that there was evidence which showed that one set of offenses or another actually existed. 99 Ill. App. 3d at 1137, 425 N.E.2d at 1315, citing *United States v. Spock* (1st Cir. 1969), 416 F.2d 165.

Relying on *Gathings*, defendant in the instant case argues that the trial court, by inquiring during *voir dire* as to whether the potential jurors could follow Illinois law which does not require that the State produce a body in order to convict a defendant, broke up the jury's consideration of the elements of the crime as a whole and caused the jury to take a step-by-step approach similar to that in *Gathings*. We disagree.

■ Supreme Court Rule 234 (107 Ill. 2d R. 234), made applicable to criminal cases by Supreme Court Rule 431 (107 Ill. 2d 431), provides:

> "The court shall conduct the *voir dire* examination of prospective jurors by putting to them questions it thinks appropriate touching their qualifications to serve as jurors in the case on trial. The court may permit the parties to submit additional questions to it for further inquiry if it thinks they are appropriate, or may permit the parties to supplement the examination by such direct inquiry as the court deems proper. Questions shall not directly or indirectly concern matters of law or instructions. The court may acquaint prospective jurors with the general duties and responsibilities of jurors." (107 Ill. 2d R. 234.)

The purpose of Rule 234 is to shorten the *voir dire* process by eliminating questions which do not advance the purpose of the *voir dire* procedure to ascertain bias or prejudice on behalf of prospective jurors. (*People v. Stack* (1986), 112 Ill. 2d 301, 493 N.E.2d 339.) The present issue requires that we determine whether the trial court's *voir dire* questioning of prospective jurors was a proper method of exposing any bias or prejudice among prospective jurors, or if the questioning violated Rule 234 by directly or indirectly concerning matters of law or instructions. While we are not aware of any precise standard specifically intended to be applied in determining

whether a trial court crossed this threshold between posing questions reasonably expected to ferret out any bias or prejudice among prospective jurors, and posing questions concerning matters of law or instructions, we find the historical and practice notes to Rule 234 (Ill. Ann. Stat. ch. 110A, par. 234, Historical and Practice Notes (Smith-Hurd 1985)), and case law concerning Rule 234, helpful in resolving this issue.

■ The historical and practice notes to Rule 234 offer a rule stated by the supreme court of Pennsylvania in *Commonwealth v. Calhoun* (1913), 238 Pa. 474, 86 A. 472, as a "sound guide to practice" under Rule 234. This rule states that "[t]he prospective juror '...may be asked the broad question whether, if sworn as a juror, he would accept and act upon the law as stated to him by the court; and this is as far as the examination on *voir dire* may proceed along that line.'" (Ill. Ann. Stat. ch. 110A, par. 234, Historical and Practice Notes, at 486 (Smith-Hurd 1985), quoting *Calhoun,* 238 Pa. at 481, 86 A. at 475.) However, in the next paragraph of the historical and practice notes it is recognized that the Illinois Supreme Court has sanctioned a certain amount of questioning on matters of law in criminal cases (citing the recent case of *People v. Zehr* (1984), 103 Ill. 2d 472, 469 N.E.2d 1062 (incorrectly cited as *People v. Lehr*), in addition to other less recent cases); and that a trial court's violation of Rule 234 by asking questions related to matters of law may constitute harmless error (citing *People v. Lykins* (1978), 65 Ill. App. 3d 808, 382 N.E.2d 1242 (incorrectly cited as *People v. Lykuis*)). Ill. Ann. Stat. ch. 110A, par. 234, Historical and Practice Notes, at 486 *(Smith-Hurd 1985).*

Although our research reveals no reported cases in which a court considered whether it is error to inquire of prospective jurors if they possess any prejudice or bias which would have them require the State to produce a victim's body before they could find a defendant guilty, we are aware of cases which consider related issues of comparable magnitude. For instance, a number of cases have held that Rule 234 prohibits questioning during *voir dire* concerning an anticipated defense theory of self-defense. (See *People v. Kindelan* (1986), 150 Ill. App. 3d 818, 502 N.E.2d 422; *People v. Kendricks* (1984), 121 Ill. App. 3d 442, 459 N.E.2d 1137; *People v. DeSavieu* (1983), 120 Ill. App. 3d 420, 458 N.E.2d 504.) On the other hand, the court in *People v. Davis* (1983), 95 Ill. 2d 1, 447 N.E.2d 353, permitted the State to inquire as to whether the jurors could follow the law even if the evidence revealed that the defendant did not actually do the shooting. The court in *Davis* stated that the State's inquiry did not

improperly concern the law of accountability. (*Davis*, 95 Ill. 2d at 18, 447 N.E.2d at 361.) Likewise, the court in *People v. Stack* (1986), 112 Ill. 2d 301, 493 N.E.2d 339, allowed the defendant to inquire during *voir dire* as to possible prejudice or bias of prospective jurors pertaining to defendant's defense of legal insanity. In *Stack*, the court recognized that the defense of legal insanity is known to be a controversial issue subject to bias or prejudice. (*Stack*, 112 Ill. 2d at 312-13, 493 N.E.2d at 444-45.) Another controversial issue, the death penalty, has been considered an issue properly made a subject of inquiry during *voir dire*. (See *People v. Gaines* (1981), 88 Ill. 2d 342, 430 N.E.2d 1046.) Although the issue of whether a suspect charged with murder can be proved guilty beyond a reasonable doubt where the State is unable to produce direct evidence of the victim's corpse may not be as commonly controverted as topics such as the insanity defense or the death penalty, we believe, nonetheless, that a prospective juror who has deep-seated preconceived notions concerning the necessity of direct evidence of a victim's corpse in order to sustain a guilty verdict presents prejudice against the State's case of a magnitude similar to that of prejudice concerning matters such as the death penalty or an insanity defense. The focus must be on the deep-seatedness, steadfastness or immutability of the prejudice, and corresponding insurmountable burden placed on the State, rather than on the social prevalence of the controversy surrounding a given topic.

In *People v. Zehr* (1984), 103 Ill. 2d 472, 469 N.E.2d 1062, our supreme court reversed defendant's conviction of home invasion, burglary and aggravated battery where the trial court denied defendant's request that the court ask supplemental *voir dire* questions concerning burden of proof, that a defendant's failure to testify in his own behalf cannot be held against him and presumption of innocence. In *Zehr*, the State argued that because the questions refused by the trial court pertained to matters of law or instructions, the circuit court correctly refused to pose the questions to prospective jurors. (103 Ill. 2d at 476, 469 N.E.2d at 1064.) It was the State's contention in *Zehr* that potential jurors were sufficiently questioned in this regard by the trial court's inquiry as to whether they would follow the law as given to them by the court even though they might personally disagree with it and whether any reason, moral, religious or otherwise, would prevent their being fair and impartial. (103 Ill. 2d at 477, 469 N.E.2d at 1064.) The defendant countered by arguing that, even assuming the questions tendered by defendant pertained indirectly to questions of law, each question was directed to the

heart of a particular bias or prejudice. 103 Ill. 2d at 477, 469 N.E.2d at 1064.

■ In resolving this controversy, the supreme court in *Zehr* considered it essential to the qualification of jurors in a criminal case that the jurors know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him. (*Zehr*, 103 Ill. 2d at 477, 469 N.E.2d at 1064.) Further, the court stated that if a juror has a prejudice against any of the basic guarantees stated above, an instruction given at the end of trial will have little curative effect. (*Zehr*, 103 Ill. 2d at 477, 469 N.E.2d at 1064.) Additionally, and more pertinent to the case now before us, the *Zehr* court stated that it is equally important that a juror who finds that the State has sustained its burden of proof have no prejudice against returning a verdict of guilty. 103 Ill. 2d at 477, 469 N.E.2d at 1064.

■ While the *Zehr* court did not specifically address the propriety of asking prospective jurors whether they could find a defendant guilty without requiring that the State produce the victim's body, we consider the reasoning of the court applicable nonetheless. Because Illinois law does not require the production of a victim's body in order to sustain a verdict of guilty on a murder charge, a prospective juror who will find a defendant guilty of murder only upon the production of the victim's body is prejudiced against the State. If the State were required to produce a victim's body in order to sustain its burden of proof in a murder trial, defendants would be encouraged to thoroughly dispose of a victim's body to preclude the possibility of being proved guilty on a murder charge. Thus, while it is understandable that a prospective juror may require proof of death by direct evidence before finding a defendant guilty of murder, the law provides that circumstantial evidence may be sufficient; therefore, to allow such a prospective juror to be sworn as a juror in a murder case unfairly prejudices the State's case.

Similar to prejudice concerning the basic guarantees for which the *Zehr* court considered an instruction given at the end of trial to have little curative effect, so too, we consider a prejudice concerning the necessity of producing a body in order to sustain a murder conviction to be of such grave magnitude and of the nature of prejudice so deeply engrained that such prejudice may not be overcome by instructions given at the close of the evidence. While we are unable to find specific guidelines to be followed by a trial court in attempting to reveal potential prejudice among prospective jurors, the standard

for evaluating a trial court's exercise of its discretion is whether the means employed to test prospective jurors' impartiality create a reasonable assurance that prejudice would be discovered, if present. (*People v. Washington* (1982), 104 Ill. App. 3d 386, 390, 432 N.E.2d 1020, 1024.) In order to effectively empanel a jury free of bias or prejudice against a State case wherein the victim's body has not been recovered, it is necessary to inquire of the potential jurors whether they possess any prejudice or bias which might preclude their finding of guilt beyond a reasonable doubt where the State is unable to produce direct evidence of the victim's body. A general question pertaining to whether a prospective juror will set aside any prejudices and follow Illinois law may not be sufficient when a juror has a strong conviction that, unknown to the prospective juror, is contrary to Illinois law. The allowance of circumstantial proof of *corpus delicti* is one such instance. Although an individual may be entitled to require direct proof before believing matters outside the courtroom, and in no instance settling for proof by circumstantial evidence, such an individual is not capable of being an impartial fact finder in an Illinois court conducting a trial where circumstantial evidence is presented.

Our decision in this case should not be taken as standing for the proposition that inquiry of potential prejudice or bias on behalf of potential jurors may be pursued with unbridled discretion. This is not so, as such practice would stand in diametric opposition to and thwart the intended purpose of Rule 234. As was the procedure undertaken in the present case, as illustrated by the examples set out at the initiation of this discussion, such inquiry should be presented in a neutral and delicate manner by the trial court when requested so to do. This will prevent claims such as that presented by defendant, to the effect that such inquiry assimilates special interrogatories which direct the jury's verdict, from becoming valid. Unacceptable emphasis or directing a verdict remains unacceptable. In the instant case the court expressed an awareness of unacceptable emphasis when the State requested that the trial court include in its *voir dire* inquiry questions intended to discover any prejudice or bias concerning the anticipated lack of direct evidence of the victim's body. The trial court recognized that there exists no pattern jury instruction specifically concerning the possibility of finding guilt without direct evidence of the victim's body, and attempted to discover any prejudice among prospective jurors during *voir dire*, over the defendant's objection. Subsequently, the trial court refused the State's submission of a nonpattern jury instruction concerning the possibility of a find-

ing of guilt without direct evidence of the victim's body, stating that such an instruction would constitute unacceptable emphasis. We find the trial court's procedure proper.

■ The next issue we are asked to consider is whether the trial court erred in refusing to allow a mental examination of Jimmy Faulkner or an evidentiary hearing regarding his mental condition. On July 30, 1987, the defendant filed a motion seeking to have his son Jimmy examined by a psychiatrist. An affidavit of the defendant's wife, also Jimmy's mother, to the effect that Jimmy had become abusive and used drugs and alcohol, was attached to the motion. The court refused to find this sufficient to require that Jimmy submit for mental examination, and the motion was denied. At trial, defendant was not prohibited from questioning Jimmy concerning his mental health and counseling undergone by him. Nor was defendant prohibited from receiving records of Jimmy's counseling. This makes defendant's reliance upon *People v. Dace* (1983), 114 Ill. App. 3d 908, 449 N.E.2d 1031, somewhat misplaced because in *Dace* the defendant was not allowed to discover the mental health records of the State's key witness. (*Dace*, 114 Ill. App. 3d at 912, 449 N.E.2d at 1033.) We agree with the ruling of *Dace* that the mental history of a witness is relevant to his credibility and is a permissible area of impeachment. (*Dace*, 114 Ill. App. 3d at 913, 449 N.E.2d at 1034.) However, in the instant case, defendant was not denied access to any of Jimmy's mental health records and was not prohibited from impeaching his testimony by reference to these records. Reviewing the record, we find that Jimmy's testimony was extensive, and it does not appear that the witness lacked the ability to understand the nature of the oath, or a capacity to observe, recollect and communicate. (*People v. Dixon* (1961), 22 Ill. 2d 513, 516, 177 N.E.2d 269, 273.) Therefore, we are unable to find that the trial court abused its discretion in determining that the witness was competent to testify. *People v. Davis* (1957), 10 Ill. 2d 430, 437, 140 N.E.2d 675, 680.

■ ■ The final issue remaining for our consideration is whether the trial court erred in sustaining the State's objection to the defendant's question on cross-examination of Jimmy Faulkner concerning what was said during the meeting between Jimmy and a prosecuting attorney and an investigating police officer, which took place at Jimmy's school. At the outset, we agree with defendant's proposition that a refusal to allow impeachment of an important witness who offers material testimony may be grounds for reversal. (*Smith v. Illinois* (1968), 390 U.S. 129, 19 L. Ed. 2d 956, 88 S. Ct. 748.) However, the record does not indicate that the court prohibited the defendant

from impeaching Jimmy's testimony. All that is indicated in the record is that the trial court sustained an objection to a question put to Jimmy by the defendant which was unclear, or, at a minimum, nonspecific. The question asked and the objection sustained are as follows:

> "DEFENSE COUNSEL: At that point in time were you told anything by the State's Attorney's Office or by Officer McCoskey?
>
> STATE'S ATTORNEY: I'm going to object, Your Honor, that's a very unclear question plus it's beyond the scope of direct examination."

The trial court sustained the objection, and defense counsel pursued that line of questioning no further. There is nothing to indicate that the defense counsel could not have successfully elicited the desired testimony by rephrasing the question in a more specific, and thereby less unclear, wording. To have properly preserved for review the determination of whether the desired testimony was properly excluded, defendant should have made an offer of proof as to what he believed that testimony would have been. (*People v. Gordon* (1980), 82 Ill. App. 3d 906, 403 N.E.2d 570.) Moreover, had defendant desired to properly present this issue on appeal, it should have been included in a written motion for a new trial. (*People v. Friesland* (1985), 109 Ill. 2d 369, 488 N.E.2d 261.) Under these circumstances, defendant cannot now be heard to complain of this alleged error, and the trial court's ruling will not be disturbed.

For the foregoing reasons, the judgment of the circuit court of Williamson County is hereby affirmed.

Affirmed.

HARRISON and RARICK, JJ., concur.