**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 180570-U

Order filed June 3, 2021
Modified Order Upon Denial of Rehearing June 29, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Rock Island County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0570 Circuit No. 16-CF-686 |
| | ) | |
| KELVIN ARNEZ GATHINGS III, | ) ) | Honorable Carol M. Pentuic, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE WRIGHT delivered the judgment of the court.
Justices Holdridge and Lytton specially concurred.

_____

**ORDER**

¶ 1     *Held*:  (1) The State erroneously introduced evidence to bolster a witness's credibility and vouched for that witness's credibility during its rebuttal argument, but the cumulative effect of these otherwise forfeited errors does not warrant review based on the plain error doctrine. (2) The court did not err by playing an audio recording in open court during jury deliberations.

¶ 2     Defendant, Kelvin Arnez Gathings III, appeals his conviction for aggravated battery with

a firearm. Defendant argues: (1) the cumulative effect of several errors committed by the State

deprived him of his right to a fair trial, and (2) the court erred by playing an audio recording in open court for the jury after deliberations were underway. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        The State charged defendant by information with aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)), a Class X felony. The matter proceeded to a jury trial.

¶ 5        During *voir dire*, the State asked,

>        "[THE STATE]: You may hear evidence in this case that some witnesses have a criminal history. Do any of you believe that you can absolutely not believe somebody who may have a criminal record if they testify on the stand under oath? Does anybody believe they would absolutely not believe that person? ***
>
>                                    * * *
>
>        *** [T]o be more direct, if somebody were to get on the stand and testify under oath and it came out that they had a criminal record or prior conviction, are you saying that you would absolutely not believe that person?"

Later, the State asked,

>        "For those of you that have had kids that are teenagers or have had special experiences with kids that are teenagers, do you feel that you can tell when a kid is being truthful or not? If you feel like you can tell when a child or teenager is telling the truth, could you raise your hand?"

The State also asked, "[D]o you all realize that [criminal television programs] are not like real life at all. They aren't solved in thirty minutes or an hour. There's not always forensic evidence, or someone saying, oh, I did it? Everybody understands those are not based on reality for the most part?" Finally, the State asked, "Do any of you believe that you could never find somebody guilty

2

if there's zero forensic evidence? *** If there's other evidence but it's not forensic evidence, that you could never find somebody guilty?"

¶ 6                                     A. Domingo "Mingo" Vertez

¶ 7        Following opening statements, the prosecution called its first witness, Domingo "Mingo" Vertez. Vertez testified that on August 10, 2016, Juan Hernandez and Hernandez's girlfriend, Christian Guerrero, arrived in the alley near Vertez's residence to give Vertez a ride to work. Vertez entered the backseat of the vehicle. While sitting in Hernandez's vehicle, Vertez observed an individual wearing a dark-colored hooded sweatshirt approach the vehicle and position himself on the driver's side of the vehicle between the driver's and passenger's doors. Vertez did not see the individual's face. According to Vertez, the individual began shooting at Hernandez, who was seated behind the steering wheel. When the shooting began, Hernandez immediately started to drive away.

¶ 8                                      B. Christian Guerrero

¶ 9        Christian Guerrero testified that on August 10, 2016, she was present in Hernandez's vehicle. According to Guerrero, the couple drove to an alley near Vertez's residence for the purpose of giving Vertez a ride to work. Guerrero was seated in the front passenger seat. After entering the vehicle, Vertez was seated behind her in the backseat of the vehicle. While Guerrero, Hernandez, and Vertez were talking, Guerrero observed an individual approaching the vehicle on foot. This individual was wearing a dark-colored hooded sweatshirt with the hood up. Guerrero could not see this individual's face. The individual produced a gun, appeared to aim the weapon at the backseat, and began shooting. After the shooting began, Hernandez immediately began driving away from that location.

3

¶ 10                      C. Juan "Charlie" Hernandez

¶ 11          Juan "Charlie" Hernandez testified that on August 10, 2016, at approximately 10 p.m., he was seated in the driver's seat of his vehicle in an alley behind Vertez's residence. Hernandez explained that his girlfriend, Guerrero, was seated in the front passenger seat as they waited for Vertez. Hernandez intended to provide Vertez with a ride to work. After Vertez arrived and entered the vehicle, Hernandez heard someone knocking on the rear passenger window on the driver's side of his vehicle. The knocking sound was following by the sound of gunshots. When Hernandez turned around, Hernandez saw an individual wearing a dark-colored hooded sweatshirt with the hood up and also observed bullets flying toward Hernandez's face. Hernandez immediately began driving away, but soon realized he had been struck with a bullet. The bullet had entered Hernandez's back and became lodged next to his heart.

¶ 12                          D. J.R. "Chewy"

¶ 13          J.R. "Chewy" testified that he was 15 years old at the time of trial. On August 10, 2016, around the time of the shooting, J.R. was outside Vertez's residence with Vertez, A.L., and A.J. Moments after J.R. saw Vertez enter Hernandez's vehicle, J.R. heard four or five gunshots. When J.R. looked toward Hernandez's vehicle, he observed an individual in a black hooded sweatshirt running away from the driver's side of the vehicle toward the alley. The individual's hood was over their head. Following these observations, J.R. ran after the vehicle and arrived at A.L.'s residence, where J.R. saw defendant outside of A.L.'s residence. According to J.R., defendant appeared to be panicked and told J.R. to "Get the hell out of here."

¶ 14          Later that same night, J.R. met with A.J., A.L., and defendant at defendant's residence. During this encounter, defendant stated that he tapped on the vehicle window of a vehicle with a

4

gun, and after seeing Vertez seated in the vehicle, defendant began shooting. According to J.R., defendant did not like Vertez and thought Vertez was a "snitch."

¶ 15    J.R. also testified that the day before the shooting, defendant showed J.R. a gun. The day after the shooting, defendant requested J.R., A.J., and A.L. to retrieve a gun from behind the wall at A.L.'s residence and give it to Anthony "Hoot" Beserra. J.R. testified that A.J. retrieved the gun from behind a wall at A.L.'s residence. The State presented People's exhibit No. 16H, a photograph of the wall in A.L.'s residence and People's exhibit No. 20F, a photograph of the recovered gun, for J.R. to review. After viewing both photographs, J.R. identified the gun depicted in both photographs as the same gun that A.J. took from the wall and the same gun that defendant displayed to J.R. the day before the shooting.

¶ 16                                                E. A.J.

¶ 17    A.J. testified that he was 16 years old at the time of trial. A.J. was together with J.R. and A.L. at the time of the shooting on August 10, 2016, at approximately 10 p.m. A.J. testified that while standing together with his friends, A.J. noticed Hernandez and Guerrero sitting in a vehicle parked in the alley behind Vertez's residence. A.J. described how Vertez left his residence and then entered the backseat of Hernandez's vehicle. According to A.J., moments later, an individual appeared and started shooting a gun. According to A.J., the shooter wore a black hooded sweatshirt with the hood up. A.J., J.R., and A.L. ran together toward the corner of the block in order to see where the vehicle was headed and eventually arrived at A.L.'s residence, where they stayed for a short time. While at A.L.'s residence, A.J. saw defendant outside the residence. Defendant was sweating, appeared to be panicked, and told A.J. to "get out of here."

¶ 18    Regarding a subsequent conversation between A.J. and defendant, the following colloquy occurred between A.J. and the State:

5

"[THE STATE]: *** When you were at [defendant's] after the shooting, what did he tell you about the shooting?

[A.J.]: Just like—like he shouldn't have done it.

[THE STATE]: Okay. What did you ask him about the shooting?

[A.J.]: Like why did you do it.

[THE STATE]: And he said what?

[A.J.]: Like he didn't really know.

[THE STATE]: He didn't know why he had done it? He told you that—he told you that he shot at the car?

[A.J.]: No, not exactly.

[THE STATE]: What did he tell you?

[A.J.]: He just like regretted doing it.

[THE STATE]: He regretted doing it?

[A.J.]: Uh-huh.

[THE STATE]: Doing what?

[A.J.]: Shooting at the car, I guess."

According to A.J., defendant believed Vertez and Hernandez were both "snitches."

¶ 19     The next day, A.J. assisted J.R. and A.L. when packing up defendant's clothes into bags at defendant's residence. He also accompanied J.R. and A.L. to A.L.'s residence, where A.J. retrieved a gun from the wall. A.J. identified People's exhibit Nos. 15 and 16H as a photograph of the gun in its hiding place in the wall and a photograph of the wall without the gun, respectively. The prosecutor presented A.J. with People's exhibit No. 20F, a photograph of the recovered gun. A.J. told the prosecutor that the photograph depicted the same gun that A.J. removed from the wall.

Also, A.J. recognized the gun as the same one that defendant had shown him a few days before the shooting while A.J. was at defendant's residence.

¶ 20                                    F. A.L.

¶ 21        A.L. testified that he was 13 years old at the time of trial. On August 10, 2016, at the time of the shooting, A.L. was with J.R. and A.J. near the alley behind Vertez's residence. A.L. observed Hernandez and Guerrero in a vehicle. A.L. saw Vertez enter the vehicle. A person approached and started shooting at the vehicle. A.L. testified that the man wore a dark-colored hooded sweatshirt with the hood up. Upon hearing the gunshots, A.L. ran to see where the vehicle went. A.L. then ran to his residence. A.L., J.R., and A.J. stayed at A.L.'s residence for approximately five minutes. A.L., J.R., and A.J. then returned to the scene of the shooting where they saw a neighbor who let them into Vertez's house. After approximately an hour and twenty minutes, A.L., J.R., and A.J. returned to A.L.'s residence. A.L. saw defendant in A.L.'s front yard, and defendant told A.L. to leave. At the time, A.L. observed that defendant appeared to be nervous.

¶ 22        The following day, A.L. went to defendant's residence and helped pack defendant's clothes into bags. He also helped to retrieve a gun from A.L.'s residence. The prosecutor displayed People's exhibit No. 16H, a photograph of the wall where the gun had been, and People's exhibit No. 20F, a photograph of the recovered gun, to A.L. A.L. testified that the gun depicted in the photographs appeared to be the same gun retrieved from the wall at his residence. Initially, A.L. stated that he could not remember who retrieved the gun from the wall, but later A.L. stated he believed A.J. retrieved the gun. A.L. also testified that defendant had shown A.L. the same gun before the shooting at defendant's residence.

¶ 23                                    G. Miguel Lopez

¶ 24         Miguel Lopez testified that his younger brother is J.R. J.R., A.J., and A.L. asked Lopez to contact Beserra the day after Hernandez was shot. According to Lopez, defendant wanted Lopez to deliver a gun to Beserra. J.R., A.J., and A.L. showed Lopez the gun behind the wall. Lopez observed one of the boys take the gun from the wall. Lopez left the residence and returned approximately an hour later. Then, J.R., A.J., and A.L. gave the gun to Lopez. Later that day, Beserra drove Lopez to Iowa to dispose of the same gun by throwing it into a wooded area near Davenport, Iowa.

¶ 25         According to Lopez's testimony, Lopez helped law enforcement recover the gun at that location. The prosecutor displayed two photographs, People's exhibit No. 16H and People's exhibit No. 20F to Lopez, at which time Lopez testified that People's exhibit No. 16H depicted the gun on the wall and People's exhibit No. 20F depicted the same gun that Lopez eventually discarded in the woods.

¶ 26                                 H. Detective Jason Smith

¶ 27         Jason Smith testified that he was a detective with the Moline Police Department. On August 12, 2016, he conducted a search of defendant's residence pursuant to a search warrant. Smith located three black hooded sweatshirts inside a plastic garbage bag. The sweatshirts were collected for testing. The sweatshirts were later admitted as People's exhibits Nos. 24, 25, and 26.

¶ 28                                    I. Ellen Chapman

¶ 29         Ellen Chapman, a forensic scientist employed by the Illinois State Police Forensic Science Center in Chicago, testified that she conducted a gunshot residue analysis of three black hooded sweatshirts (People's exhibits Nos. 24, 25, and 26) submitted to her by the Moline Police Department. Chapman testified that on People's exhibit No. 25 she found high levels of lead

particles and the presence of antimony—a substance commonly found in gunshot residue—on the left cuff of the black sweatshirt. According to Chapman, the tests she conducted were inconclusive because the black sweatshirt had particles consistent with gunshot residue, but those particles did not test positive for gunshot residue.

¶ 30                                    J. Ann Yeagle

¶ 31        Ann Yeagle, a forensic scientist employed by the Illinois State Police, testified that she discovered human DNA on the left side and back of the gun recovered by the Moline Police Department, and later entered into evidence under People's exhibit No. 9. Only the DNA from the left side of the gun was suitable for comparison. Yeagle determined the DNA was a mixture of two male contributors. Yeagle compared the sample to the DNA standards submitted by defendant, Lopez, J.R., A.J., A.L, and Beserra. However, she could not exclude defendant, Lopez, J.R., A.J., A.L., or Beserra as the source of the DNA.

¶ 32                              K. Detective Nathan Medinger

¶ 33        Detective Nathan Medinger was employed by the Moline Police Department when he investigated the shooting that occurred on August 10, 2016. In an interview, Lopez described to Medinger the location where Lopez disposed of the gun. Later, Lopez brought officers to the described location and the gun was recovered. Medinger identified the recovered gun and the State entered the gun into evidence under People's exhibit No. 9.

¶ 34        Medinger opined that due to the location of the DNA and gunshot residue, the shooter was likely left-handed. During Medinger's investigation, Medinger conducted and recorded interviews with defendant, Lopez, J.R., A.J, A.L., and Beserra. Defendant signed his *Miranda* waiver form with his left hand and Lopez, J.R., A.J, A.L., and Beserra signed the form with their right hand.

9

¶ 35                                               L. Anthony "Hoot" Beserra

¶ 36          Anthony "Hoot" Beserra testified that he was a longtime friend of defendant. The day after the shooting, Beserra called Lopez. During this conversation, Lopez told Beserra that defendant "stopped by and gave his brother something." Beserra "just put two and two together, and just— [he] went down there and then [he] *** picked [Lopez] up and [they] got rid of the gun." Beserra drove Lopez to Iowa where Lopez disposed of the gun. Beserra did not speak to defendant about the shooting.

¶ 37          During his testimony, Beserra admitted that the prosecution agreed not to use Beserra's statements about the events surrounding Hernandez's shooting against Beserra. Beserra also said he had a criminal record and was on probation at the time of trial.

¶ 38          During the prosecutor's redirect examination of Beserra, Beserra told the jury that he did not want to testify against defendant. Beserra then explained that he decided to testify because he was "trying to change [his] life."

¶ 39                                             M. Attorney Aaron Dyer

¶ 40          Aaron Dyer testified that he was an attorney and represented Beserra on several prior criminal matters. Dyer testified that he was involved in negotiations with the prosecution concerning Beserra's agreement to testify against defendant. The prosecutor asked Dyer the following question: "Did you hear [Beserra] testify that he gave a statement because he's in this spot in his life and he wants to change?" When Dyer answered affirmatively, the prosecutor asked, "In your opinion is that why he gave the statement?" Dyer believed Beserra testified because he was "trying to make a change for the better for himself."

¶ 42        During the prosecution's initial closing argument, the State argued that defendant told J.R., A.J., and A.L. to give the gun to Beserra. The State contended that defendant said this because "Beserra would know how to get rid of it." The State continued, "Beserra did try to get rid of it. He tried. And he did that for the defendant, his best friend of over ten years." The prosecution conceded that the DNA located on the left side of the recovered gun could not exclude defendant, Lopez, J.R., A.J., A.L., or Beserra. However, the jury should consider the location of the DNA evidence. Further, the prosecution argued that while the particles found on People's exhibit No. 25—the left cuff of the black hooded sweatshirt were not conclusively gunshot residue, it argues that the location of the high amounts of lead particles was important. The location of the DNA and the lead particles corroborated that the shooter was also left-handed. Of the witnesses, defendant, Lopez, J.R., A.J., A.L., and Beserra, only defendant was left-handed. Finally, as evidenced by J.R., A.J., and A.L.'s testimony, defendant had the motive and the means to shoot Hernandez.

¶ 43        In its closing argument, defense counsel referred to the prosecution's witnesses as a group of "twirps." Defense counsel observed that the prosecution's witnesses were "not particularly credible." Defense counsel told the jury that "[y]ou can believe [the State's witnesses] if you choose to, but I suggest that's not credible based upon the entirety of their testimony and the other facts of this case."

¶ 44        Defense counsel then told the jury that it thought Beserra "was being very honest." Counsel argued as follows:

> "[Beserra] told you that he is mending his ways. He's going to change his life around and that is to be commended. *** [Beserra], by all intents and purposes, his

presence here, he testified here as the State wanted him to do, because he had committed a crime and they had given him immunity."

¶ 45 In rebuttal, the State argued, "Now, Anthony Beserra, boy, if there was ever a prodigal son, *** I would submit to you that if his testimony wasn't the truth, he wouldn't be here joining us today." Defense counsel did not object to the State's argument. The court instructed the jury that counsel's arguments were not evidence and "[a]ny statement by the attorneys that is not based upon evidence should be disregarded." The court also instructed the jury that only they were the "judges of the believability of the witnesses and the weight to be given to the testimony of each of them."

¶ 46 During deliberations, the jury requested transcripts of the testimony of J.R., A.J, and A.L. Instead of sending the transcripts to the jury room, the court suggested playing the recorded audio of each witness's testimony in the courtroom with the jurors and parties present. Neither party objected. The court admonished the parties not to speak in the presence of the jury and brought the jury into the courtroom. The court reporter played the recording of J.R.'s testimony for the jury while the parties were present in the courtroom. No one spoke while the recording played. After the jury heard J.R.'s recorded testimony, the foreperson of the jury sent a note to the court. The foreperson's note stated that the jury did not need to hear the recordings of A.J. and A.L.'s testimony.

¶ 47 The jury found defendant guilty of aggravated battery with a firearm. The court sentenced defendant to 18 years' imprisonment. Defendant appeals.

¶ 48                                II. ANALYSIS

¶ 49 On appeal, defendant raises two contentions of error in support of his request for this court to reverse his conviction and remand the matter for a new trial. First, defendant contends that a

12

pattern of prosecutorial misconduct resulted in an unfair trial. Second, defendant claims judicial error arose when the trial court arranged for the jury to listen to recorded testimony after deliberations began. The State submits that neither prosecutorial misconduct nor judicial error exists in this case. In addition, the State observes that neither issue was properly preserved by defense counsel for our review.

¶ 50 Defendant acknowledges that he failed to preserve both of these issues for appellate review. See *People v. Johnson*, 238 Ill. 2d 478, 484 (2010) ("When, as here, a defendant fails to object to an error at trial and include the error in a posttrial motion, he forfeits ordinary appellate review of that error."). However, defendant argues his forfeiture of both issues should be excused based on the application of the second prong of plain error doctrine.

¶ 51 The plain error doctrine provides a limited exception to the general rule of forfeiture. The first step of the plain error analysis determines whether a clear or obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). A defendant may establish plain error by either showing that (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against him, or (2) the error is so serious that it affected the fairness of his trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Sebby*, 2017 IL 119445, ¶¶ 50, 51.

¶ 52 Notably, defendant does not rely on the first prong of plain error by claiming the evidence was closely balanced. Instead, defendant asserts that his forfeiture should be excused based on the second prong of plain error. In essence, defendant agues the pattern of prosecutorial misconduct, together with judicial error, compromised the integrity of the judicial process. *Id.* ¶ 50.

¶ 53                                    A. Prosecutorial Misconduct

¶ 54        Defendant challenges his conviction by claiming he was denied a fair trial due to the
cumulative impact of the following four acts of prosecutorial misconduct: (1) improperly
bolstering the credibility of the State's witness, Beserra, by presenting testimony from Beserra's
attorney; (2) improperly vouching for Beserra's credibility during the State's rebuttal argument;
(3) improperly presenting misleading expert testimony that was not relevant to guilt or innocence;
and (4) improperly indoctrinating the jury to view the upcoming testimony of the State's witnesses
without considering the age or prior record of the witnesses. We begin our plain error analysis by
first considering whether the alleged prosecutorial misconduct, if any, rises to the level of "clear
or obvious" error. See *Piatkowski*, 225 Ill. 2d at 565.

¶ 55                                           1. *Voir Dire*

¶ 56        Defendant argues the prosecutor unfairly indoctrinated the jury by asking a series of
improper questions during *voir dire*. Defendant takes issue with the following questions: "did any
potential jurors have experience with teenagers[?]; did the jurors know when teenagers were being
truthful[?]; did any jurors watch crime shows and were they aware that forensic evidence was not
always presented[?]; could anyone not find [defendant] guilty without forensic evidence[?]; and
would any juror not believe a witness with a criminal record[?]"

¶ 57        The case law instructs that an attorney's v*oir dire* examination "must not be 'a means of
indoctrinating a jury, or impaneling a jury with a particular predisposition.' [Citation.] Rather than
a bright-line rule, this is a continuum. Broad questions are generally permissible." *People v.
Rinehart*, 2012 IL 111719, ¶ 17 (quoting *People v. Bowel*, 111 Ill. 2d 58, 64 (1986)). Our supreme
court has held that "The purpose of *voir dire* is to ascertain sufficient information about
prospective jurors' beliefs and opinions so as to allow removal of those members of the venire

whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath." *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993). In other words, the State may always make inquiries to ascertain whether a potential juror may have deep-seated beliefs that might prevent that particular juror from returning a guilty verdict when the State's evidence is sufficient. *People v. Faulkner*, 186 Ill. App. 3d 1013, 1025 (1989).

¶ 58     In this case, the prosecutor's questions during *voir dire* were very broad. For example, the prosecutor asked generic questions designed to reveal whether a potential juror might be unaware of his or her own bias about the inability of a juvenile witness to testify truthfully. In addition, the prosecutor advanced broadly worded questions to determine if a potential juror would automatically discredit the testimony of any witness with a previous criminal history. Based on our careful review of the record, we conclude the prosecutor's questions about credibility matters were proper and did not involve any prosecutorial misconduct in the form of indoctrinating this jury.

¶ 59     Next, defendant claims the prosecutor indoctrinated the jury by asking whether the jurors understood that real criminal investigations are not like the criminal investigations depicted in fictional television programs. The prosecutor asked, "Do any of you believe that you could never find somebody guilty if there's zero forensic evidence? *** If there's other evidence but it's not forensic evidence, that you could never find somebody guilty?"

¶ 60     Given the prevalence of forensic-based true-life crime dramas, together with a plethora of fictional law enforcement programs available to the public, this question was proper. The prosecutor's line of questioning would help determine if a potential juror could keep an open mind about the State's evidence, even if that evidence did not include conclusive forensic evidence. Again, these questions were proper and broad enough to allow the State to determine a potential

15

juror's misconception that forensic evidence was required in order to sustain the State's burden of proof beyond a reasonable doubt. Therefore, we conclude that prosecutorial misconduct did not take place during *voir dire*.

¶ 61                                  2. Dyer's Testimony

¶ 62        Next, we consider defendant's contention that the State impermissibly bolstered Beserra's testimony by presenting Beserra's defense counsel as a State's witness. The obvious purpose for offering testimony from Beserra's attorney was to inform the jury that this attorney knew Beserra well, and based on this knowledge, the attorney opined that Beserra testified against his friend only because Beserra was "trying to make a change for the better."

¶ 63        The case law is clear and establishes "it is generally improper to ask one witness to comment directly on the credibility of another witness" except for, in some cases, after the opposing party had attacked that witness's character. *People v. Becker*, 239 Ill. 2d 215, 236 (2010); Ill. R. Evid. 608 (eff. Jan. 6, 2015). Here, such an attack on Beserra's altruistic motivation did not occur. Therefore, simple prosecutorial error results from calling Beserra's attorney as a witness but does not rise to the level of prosecutorial misconduct.

¶ 64                                  3. Forensic Evidence

¶ 65        Defendant argues that the State improperly misled the jury by introducing inconclusive DNA and gunshot residue evidence.[1] Claiming that this evidence had no relevance, defendant asserts that it was prosecutorial misconduct to introduce such evidence. In contrast, the State argues the fact that defendant could not be excluded as a potential contributor to the DNA on the gun and this fact rendered the DNA evidence relevant.

---

[1]Chronologically, the jury received Dyer's testimony after the testimony concerning gunshot residue but before the testimony concerning DNA analysis. To reduce redundancy, we address all of the scientific testing together.

16

¶ 66 Generally, "[a]ll relevant evidence is admissible, except as otherwise provided by law." Ill. R. Evid. 402 (eff. Jan. 1, 2011). Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 67 Here, the DNA evidence and gunshot residue evidence had relevance because it demonstrated that the State attempted to, but could not, conclusively link defendant to the gun that was recovered with the assistance of Lopez. This evidence was relevant for two reasons. First, it allowed the jury to consider that defendant had not been completely excluded as the DNA contributor. Second, this evidence wards off the possibility that the defense might successfully convince a juror that the prosecution's case was based on an incomplete investigation that did not make an attempt to conduct DNA testing.

¶ 68 Finally, we would be remiss without noting that the prejudicial impact of this inconclusive evidence was very slight. It is entirely possible that some jurors considered this DNA evidence to be exculpatory in nature. Therefore, the introduction of the inconclusive DNA and gunshot residue test results was proper.

¶ 69 4. State's Rebuttal Argument

¶ 70 Defendant argues the State improperly vouched for the credibility of Beserra by characterizing Beserra as the "prodigal son" and then suggesting that "if [Beserra's] testimony wasn't the truth, he wouldn't be here joining us today." While prosecutors generally have a wide

latitude when delivering closing arguments, a prosecutor may not vouch for the credibility of a witness, because there is a reasonable possibility that " ' "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." ' " *People v. Williams*, 2015 IL App (1st) 122745, ¶ 13 (quoting *People v. Townsend*, 136 Ill. App. 3d 385, 402 (1985), quoting *United States v. Young*, 470 U.S. 1, 18-19 (1985). Here, the prosecutor's rebuttal argument improperly vouched for the credibility of Beserra by implying that if the prosecutor believed Beserra was not being truthful, then Beserra "wouldn't be here joining us today." This argument violated the well accepted boundaries for proper prosecutorial argument, even in the context of rebuttal argument.

¶ 71                              5. Integrity of the Judicial Process

¶ 72        Here, defendant argues the cumulative effect of all four prosecutorial errors, alleged above, constitutes second prong plain error. Importantly, defendant has not suggested that structural error can be attributed to any one of the four individual errors, standing alone. Obviously, the cumulative impact of two prosecutorial errors is greatly reduced from the cumulative impact of all four purported prosecutorial missteps identified by defendant.

¶ 73        Defendant did not make any incriminating admissions to Beserra. Beserra was not an eyewitness to the shooting. Other State witnesses gave consistent testimony placing defendant in close proximity to the shooting shortly after the shooting occurred. One witness testified that defendant made an incriminating remark about his role in the shooting. In contrast, Beserra's testimony was limited to events resulting in Beserra and Lopez's disposal of a gun, without any purported involvement from defendant in that process. After carefully reviewing the record, it becomes apparent that the cumulative impact of the prosecutor's erroneous decision to first bolster the credibility of an ancillary witness and then vouch for that witness's credibility did not result in

18

an unfair trial that lacked integrity or rose to the level of second prong plain error. Therefore, forfeiture controls.

¶ 74                                B. Jury Deliberation

¶ 75        Lastly, defendant argues the circuit court committed error when it allowed the jurors to return to the courtroom after the jury began their deliberations. The record reveals that in response to the jury's note requesting to review the testimony of several witnesses, the circuit court permitted the jury to return to the courtroom for the purpose of listening to an audio recording of J.R.'s testimony. The record also indicates that the parties and the judge were present together in the courtroom when the audio recording was published to the jury.

¶ 76        At the time the trial court was called upon to determine the best approach to provide the jury with the information request, our supreme court had not decided *People v. Hollahan*, 2020 IL 125091. In that case, our supreme court settled existing conflicts in the case law by holding that, "a court may, after submission of the case to the jury, suspend deliberations and bring the jury back into the courtroom for supplemental instruction, when warranted, or even allow the jurors to separate temporarily outside the presence of a court officer with proper admonishments." *Id.* ¶ 25. In this case, the circuit court followed a procedure that was consistent with this holding. Therefore, based on the rationale of *Hollahan*, the circuit court did not err by allowing the jury to listen to recorded testimony in the courtroom during a short break in the jury deliberations.

¶ 77                                III. CONCLUSION

¶ 78        The judgment of the circuit court of Rock Island County is affirmed.

¶ 79        Affirmed.

19

¶ 80    JUSTICE HOLDRIDGE, specially concurring:

¶ 81    I agree with the disposition in this case. However, I write separately to clarify my position on two points. First, the majority finds that (1) the State committed "simple prosecutorial error" when it called Dyer as a witness, and (2) the State's rebuttal argument "violated the well accepted boundaries for proper prosecutorial argument." *Supra* ¶¶ 63, 70. I find it necessary to expound on this analysis.

¶ 82    Like the majority, I find that the State committed a plain error by presenting Dyer's testimony, which improperly bolstered Beserra's credibility. "[I]t is generally improper to ask one witness to comment directly on the credibility of another witness" absent an attack to the witness's credibility. *Becker*, 239 Ill. 2d at 236; Ill. R. Evid. 608 (eff. Jan. 6, 2015). From my review, I find that defense counsel did not directly attack Beserra's character or credibility. Thus, the State could not use Dyer's testimony to comment on Beserra's credibility. At most, defense counsel confirmed information that the State had already asked of Beserra on direct examination. Therefore, the State committed a plain error by eliciting Dyer's opinion testimony as to Beserra's character. See Ill. R. Evid 608 (eff. Jan. 6, 2015).

¶ 83    I also find that the State erred by improperly vouching for the credibility of Beserra in its rebuttal argument. The State characterized Beserra as the "prodigal son" and stated that "if his testimony wasn't the truth, he wouldn't be here joining us today." While the State may comment "on the evidence and on any fair and reasonable inference" that may be derived from that evidence (*People v Jackson*, 2020 IL 124112, ¶ 82), its argument in this case went too far. The State's comments could reasonably induce the jury to trust the State's judgment over their own. Moreover, the prosecutor's characterization of Beserra as the "prodigal son" is particularly problematic as it likened a key prosecution witness to the protagonist in the well-known biblical parable. The State's

20

second comment about Beserra's credibility compounded this error as it further bolstered Beserra's testimony. These comments reasonably could have induced the jury to trust the State's evidence over its own view. Therefore, the State's comments about Beserra's credibility were plain error.

¶ 84    After carefully reviewing the errors, I too conclude that the combination of these two errors does not rise to the magnitude of reversible structural errors under the second prong of the plain error doctrine. *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009). In particular, I note that the State's improper argument possessed very little prejudicial effect as, immediately after the State's comments in rebuttal, the court instructed the jury that the parties' arguments were not evidence, that "[a]ny statement by the attorneys that is not based upon evidence should be disregarded," and that only the jury were the "judges of the believability of the witnesses." The combined effect of these errors did not create a pervasive pattern of unfair prejudice such that a new trial is warranted. See *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005).

¶ 85    This conclusion should not be interpreted in any way as condoning the conduct of the State in this case. Although such prosecutorial misconduct may not always amount to reversible error or require a new trial (see *People v. Johnson*, 208 Ill. 2d 53, 88-117 (2003)), it is highly inappropriate, and I strongly condemn the State's conduct in this case (see *People v. Moss*, 205 Ill. 2d 139, 171 (2001)).

¶ 86    Second, as the authoring justice of *People v. Hollahan*, 2019 IL App (3d) 150556, I recognize that the supreme court has since held that it is acceptable for the court to suspend jury deliberations and allow the jury to review video or audio evidence in the courtroom in the presence of the court, the prosecutor, the defendant, and defense counsel (*Hollahan*, 2020 IL 125091, ¶¶ 24-27). Nonetheless, I maintain that the best practice in such situation remains that which I outlined in *Hollahan*, 2019 IL App (3d) 150556, ¶¶ 20-23, 28. The jury should have the opportunity to

21

review the video or audio evidence in the jury room alone. *Id.* ¶ 27. "[I]f, for some reason, a video or audio recording must be played for a deliberating jury in the courtroom, the jury should view the video in private, not in the presence of the parties, their attorneys, or the trial judge." *Id.* ¶ 28. Thus, while it was proper for the court to permit the jury to listen to the audio recording of J.R.'s testimony, best practice prescribes allowing the jury to listen to such a recording outside the presence of anyone else.

¶ 87        JUSTICE LYTTON, specially concurring.

¶ 88        I concur with Justice Wright's majority order. I also concur with paragraphs 81-85 of Justice Holdridge's special concurrence. As to paragraph 86, I agree with Justice Carter in his dissent in *People v. Hollahan*, 2019 IL App (3d) 150556, when he said, "[t]he mode and manner in which a trial court allows a jury to review a piece of evidence during jury deliberations falls within the scope of the court's inherent authority to manage its courtroom and is a matter of the court's discretion." *Id.* ¶38. "With all due respect, the majority's position on this issue is a radical departure from the traditional way reviewing courts have treated questions involving the integrity of jury deliberations." *Id.* ¶41.