NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 230593-U

NO. 4-23-0593

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 24, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| ALLEN K. SCHIMMELPFENNIG, | ) | No. 21CF332 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John P. Vespa, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Steigmann and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, finding (1) no error occurred during *voir dire* when
prospective jurors were asked whether they would require the victim's body to have
been found to convict a defendant of murder, and if so, whether they could
disregard that belief and base the verdict on the evidence; (2) defendant was not
denied effective assistance of counsel resulting from trial counsel's
cross-examination of the State's expert witness; and (3) the State met its burden of
proving the *corpus delicti* for first degree murder and concealment of a homicidal
death with circumstantial evidence where the victim's body was not found.

¶ 2    Following a jury trial, defendant, Allen K. Schimmelpfennig, was convicted of the

first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)) of Gabriel Cook and the concealment of

Cook's death (*id.* § 9-3.4(a)). Cook was reported missing on March 8, 2021, after he met with

defendant that morning and the car he had been driving was found burning in a creek bed later that

same day. Further investigation led to defendant's arrest on the aforementioned charges, despite

the fact that Cook's body had not been found.

¶ 3        On appeal, defendant contends (1) reversible error occurred during *voir dire* when jurors were asked to essentially preview the evidence and law when asked whether they would require a victim's body to have been found in order to find a defendant guilty of first degree murder, and if so, could they disregard that belief and base the verdict on the evidence; (2) he was denied effective assistance of counsel when his attorney failed to "meaningfully challenge" the foundation for an expert's opinion testimony regarding the blood evidence in this case; and (3) the State failed to prove him guilty beyond a reasonable doubt by failing to prove the *corpus delicti* for both charges. For the following reasons, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5        On June 10, 2021, defendant was charged by information with one count of first degree murder (*id.* § 9-1(a)(1)) and one count of concealment of a homicidal death (*id.* § 9-3.4(a)). A bill of indictment on both charges was filed on June 15, 2021. Defendant pled not guilty, and the case proceeded to a two-day jury trial on May 8 and 9, 2023.

¶ 6                                    A. Jury Selection

¶ 7        Before jury selection began, the State expressed its intention to ask prospective jurors a question based on the fact that Cook's body had not been found. The State acknowledged Cook's death could be proven with circumstantial evidence, without his body having been found, but it explained, "[W]hen we're picking a jury, I think it's important to know whether they're going to make the State prove something or require something that we're not required to prove." Defense counsel expressed concern that raising this issue during *voir dire* would eliminate people who "would potentially have more of an open mind on that issue" and "skew" the potential jurors to be "people inclined to convict because [it would be] getting rid of anybody who maybe they have in their mind, say, there's no body, very difficult to convict someone of murder." When the

- 2 -

trial court expressed its inclination to allow the question, defense counsel posited the issue could be explained during opening statements, but the court replied:

> "Well, it might be too late then. That was my suggestion a minute ago. If he tells them that, then could *** be 14 people in that jury box, State in opening statements says you need to realize, jurors, we're not required to have a body, to produce a body to show you that someone died for you to convict the defendant of murder. Some of the jurors might say, well, I'm not doing it, I think you do need a body, you don't have one, I'm not voting guilty, period, evidence shmevidence."

¶ 8 In response, defense counsel stated he believed any concerns would be alleviated when the jurors were asked to affirm that they would follow the law, and they would be instructed that the law is that there can be a conviction without a body. The trial court concluded the question should be asked of the jury pool, and discussion was had regarding a potential follow-up question. Defense counsel renewed his objection to the question being posed, but he acquiesced to the follow-up question. The court settled on the following: "Would you require the body of Gabriel Cook to have been found in order for you to find a defendant guilty of First Degree Murder?" and " 'If you answer 'Yes' to the preceding question, can you disregard that belief and base your verdict on the evidence?' "

¶ 9 During *voir dire*, the trial court asked the first question (whether they believed a body was required to be found) of all potential jurors. One potential juror responded affirmatively, but he also answered "yes" when asked the follow-up question about being able to disregard that belief and base the verdict on the evidence. After questioning was completed, the State excused that juror with a peremptory challenge.

¶ 10                                      B. The State's Case

¶ 11                                      1. *Deputy James Gilmore*

¶ 12            Peoria County Sheriff's Deputy James Gilmore testified that at 2:43 p.m. on March 8, 2021, he was dispatched to 1400 South Kickapoo Creek Road to investigate a car fire in the nearby creek bed. When he arrived at the scene, firefighters had already extinguished the fire, and Deputy Gilmore observed a "completely burnt SUV." The vehicle was a Jeep, and a search of the license plate number revealed it was registered to Elsie Burns. Photographs of the burnt Jeep were entered into evidence.

¶ 13                                      2. *Kathy Bianchi*

¶ 14            Kathy Bianchi, Cook's aunt, testified that in March 2021, her mother, Elsie Burns, was living with Cook at 820 Lasalle Boulevard in Marquette Heights, Illinois. She stated Cook had lived with Burns periodically over the years, but in March 2021, he had been living with her for "at least six months straight." Bianchi stated she saw Cook every weekday during February and March 2021, when she would go to her mother's house for lunch. She stated Cook did not have a vehicle of his own, but Burns had a silver Jeep Liberty that she allowed him to drive. Photographs of the vehicle were entered into evidence. On March 8, 2021, Bianchi went to her mother's house, but she did not recall if she saw Cook or the Jeep. She testified she saw Cook almost every day until he went missing. Bianchi stated it was unusual to not be in contact with Cook because they spoke daily about caring for her elderly mother (who was in hospice care at the time of trial and unavailable to testify).

¶ 15                                      3. *Emiley Pogioli*

¶ 16            Emiley Pogioli is the mother of Cook's eight-year-old daughter. She had lived in the Peoria area most of her life but moved away in fall 2020. After moving, Pogioli maintained

regular contact with Cook. Cook would speak to his daughter on the phone or video chat with her every week or so. Prior to March 2021, there was never a time when Cook would not be in contact with his daughter for months, but Pogioli and her daughter had not heard from him since March 8, 2021.

¶ 17                                4. *Ashley Huffman*

¶ 18            Ashley Huffman testified she was in a romantic relationship with Cook in 2021 and she had been his girlfriend for almost five years. During that time, she saw him "[e]very day pretty much." She stated the longest she went without seeing him was a day or two. Huffman testified Cook was living with Burns in 2021 and her Jeep was his only means of transportation. Huffman had not had any contact with Cook since March 8, 2021. She attempted to access some of his financial records but was unable to do so. On cross-examination, Huffman acknowledged Cook had been suicidal, and she "had a lot of questions" when he disappeared. She acknowledged he struggled with drug addiction. She said Cook had been traveling between Bloomington and Peoria frequently. She testified she recalled talking to Officer Kester of the Peoria County Sheriff's Office on March 9, 2021. She did not recall speaking with Deputy Gilmore, but she also acknowledged it was a long time ago.

¶ 19                                5. *Joshua Johnson*

¶ 20            Joshua Johnson testified he was the apartment manager for a building at 1353 North Second Street in Chillicothe, Illinois. Johnson stated defendant was living in that building, in apartment No. 3, in March 2021.

¶ 21                                6. *Officer Scott Bowers*

¶ 22            Officer Scott Bowers of the Peoria Police Department testified he had been with the crime scene unit since 2002. On March 25, 2021, he responded to the storage facility located

- 5 -

at 8627 North Hale Avenue in Peoria, Illinois (Northpoint Storage), to investigate a call about storage unit No. 1131. When Officer Bowers arrived at the scene, he observed the door to unit No. 1131 was open and detectives from the Peoria Police Department and Peoria County Sheriff's Office were waiting outside the unit. He could see "some blood on the ground and there were some fired shell casings inside the unit along with numerous items." A photo Officer Bowers took from outside the storage unit was admitted into evidence. Officer Bowers stated that once a search warrant was secured, he helped search the interior of the storage unit while Officer Paul Tuttle took photographs.

¶ 23                                  7. *Officer Paul Tuttle*

¶ 24            In March 2021, Tuttle was a Peoria police officer assigned to the crime scene unit and responded to Northpoint Storage. He photographed the inside of unit No. 1131 and its contents. Officer Tuttle described several photographs he took, which were entered into evidence. Officer Tuttle described those photographs showing evidence markers near the following: a "small bloodstain," several shell casings, a drink bottle, a lighter, another "small bloodstain," a "fired projectile," a clump of hair, cigarette butts, a glove, and a "large bloodstain." Officer Tuttle took a sample swab of the large bloodstain. The photographs of the inside of the storage unit also showed household furnishings, bicycles, and most notably, a red Honda motorbike with a four on the front number plate.

¶ 25            Officer Tuttle testified that on March 26, 2021, he assisted in the search of defendant's apartment on North Second Street. He took numerous photographs, which were entered into evidence. Officer Tuttle described the building as a "four-plex apartment building," with a common entrance door for all four apartments. During the search, Officer Tuttle found a

shell casing sitting on a red tray located on the top shelf of a closet. The shell casing was admitted into evidence.

¶ 26 On cross-examination, Officer Tuttle stated the cigarette butts discarded on the ground in the storage unit were also collected. He acknowledged he did not take any measurements of the bloodstain. Officer Tuttle stated that information should be in the FARO scan, explaining a FARO is a "high-end scanner" other officers are trained to use to take detailed measurements, as it creates a digital scan of a crime scene.

¶ 27 8. *Melissa Zmia*

¶ 28 Melissa Zmia testified that in March 2021, she lived in the apartment complex next door to defendant's building on North Second Street. Zmia stated defendant had lived next door for a couple of months. On the morning of March 8, 2021, Zmia was doing her normal household chores, and she observed though her window that defendant had a motorcycle or dirt bike inside his building. She saw him take it out the door and put it behind the building. She stated defendant then "got on his phone and he was pacing back and forth like he was nervous." Later, at around 11:30 a.m., Zmia observed, on surveillance cameras she has around her property, another man arriving at defendant's apartment. Because she thought he looked suspicious, she called the police.

¶ 29 Zmia took some photographs of the activity outside her apartment with her cell phone and with a surveillance camera she had placed in the window. Several photographs were entered into evidence. In one of the photographs, a man is shown getting out of a silver Jeep and walking toward the back, where defendant is standing with a red Honda motorbike. The front number plate of the motorbike, which had a four on it is visible in the photo. Zmia testified the man was talking to defendant as defendant loaded the motorbike into the back of the Jeep. Zmia observed the men having "an altercation," after which the man, whom she identified as Cook, "got

back into the vehicle," and defendant went back inside the building to grab a backpack and then got into the Jeep. Zmia testified it was around 11:30 a.m. when both men left in the Jeep.

¶ 30                    9. *Detective Garen Demery and Deputy Jonathan Hill*

¶ 31           Detective Garen Demery and Deputy Jonathan Hill of the Peoria Police Department testified as to the chain of custody of a "DUI [(driving under the influence)] kit" obtained on December 3, 2020, which contained blood and urine samples from Cook in an unrelated matter. The DUI kit was delivered to the Morton Forensic Science Laboratory for DNA comparison in this case.

¶ 32                            10. *Mary Meaux*

¶ 33           Mary Meaux, a forensic firearms examiner with the Illinois State Police, testified as an expert witness in firearms identification. She described in detail the process of determining whether a particular projectile was fired from a specific firearm. She examined all five of the cartridge casings and the two bullets in evidence in this case and determined all were fired from the same firearm, even though she had not examined the firearm itself.

¶ 34                            11. *Greg Tiemeier*

¶ 35           Greg Tiemeier, employed at RLI Insurance Company, was responsible for "facilities in real estate," in particular, the operation of surveillance cameras on the company's properties. Tiemeier testified his company provided surveillance footage to the Peoria police. Several still photographs, taken on March 8, 2021, from various surveillance cameras, were admitted into evidence. Three photographs taken from cameras on three different buildings in Peoria (located at 9000 Lindbergh Drive, 1116 West Bird Boulevard, and 8919 North Hale Avenue) showed a silver Jeep from different vantage points as it headed south on North Hale Avenue at 11:57 a.m. Additional photographs taken from two of those buildings (located at 8919

North Hale Avenue and 1116 West Bird Boulevard) showed a silver Jeep traveling north on North Hale Avenue at 1:12 p.m.

¶ 36                                    12. *Scott Roehnelt*

¶ 37          Scott Roehnelt, the branch security administrator for Busey Bank, testified he provided the Peoria police with video footage from cameras at the bank branch located at 8919 North Knoxville Avenue in Peoria. Still photographs from the video camera footage were admitted into evidence. The camera provided surveillance of the bank's drive-up window and ATM, as well as a portion of North Hale Avenue. Two photographs taken by this camera on March 8, 2021, showed a silver Jeep going northbound on North Hale Avenue at 1:12 p.m.

¶ 38                                    13. *Dr. Amanda Youmans*

¶ 39          Dr. Amanda Youmans, a forensic pathologist, testified she performs autopsies in a medical-legal setting to determine the cause and manner of death. Dr. Youmans stated she had conducted over 5,000 autopsies during her career and was certified as an expert in forensic pathology. When defense counsel was asked if he had any objection to Dr. Youmans testifying as an expert in the area of forensic pathology, he said "No, Judge."

¶ 40          Dr. Youmans testified she was asked to examine photographs "concerning an amount of blood that was found in a storage locker." Referring to the photograph of the large bloodstain, Dr. Youmans testified, "Based upon the amount of blood that I see in the photographs, I could say that a person sustained a serious penetrating injury that could have either resulted in death at the scene. If not death, they would need immediate medical attention to prevent loss of life." She stated further that such "immediate medical attention" would have to be provided "very quickly," within "minutes, maybe an hour at the most but unlikely." On cross-examination, Dr.

Youmans acknowledged she did not personally visit the storage unit or take physical measurements of the bloodstains, but she was shown 30 to 40 photographs of the scene.

¶ 41                          14. *Kimbery McGhee and Ashlee Stephenson*

¶ 42          Kimberly McGhee was a health information manager at Unity Point (a facility in the process of transitioning to Carle). Ashlee Stephenson was the medical records manager for OSF St. Francis Medical Center. Both testified they had no records showing Cook received any medical treatment at any Unity Point or OSF hospitals or treatment facilities on March 8, 2021, or over the next six to eight weeks thereafter.

¶ 43                          15. *Officer John Foster*

¶ 44          Officer John Foster, a member of the crime scene unit of the Peoria Police Department, testified he collected four .380-caliber shell casings and two projectiles from storage unit No. 1131 at Northpoint Storage. Officer Foster stated he tested those items for latent fingerprints but did not find any. Officer Foster also collected six cigarette butts at the scene, but he did not know if any testing was conducted on them.

¶ 45                          16. *Kristine Haley*

¶ 46          Kristine Haley testified her parents owned Northpoint Storage in March 2021 (the storage facility located on North Hale Avenue in Peoria). Haley took care of accounting at the facility. Haley testified that on November 1, 2020, defendant signed a rental agreement (which was admitted into evidence) for "unit 1131 and 1124." Although numbered as two units, it was actually one unit that extended the length of the building, with doors on opposite sides of the building (one door labeled No. 1131 and the other No. 1124). Haley testified defendant paid the initial rental payment of $125 in cash, but no further payments were received for the unit. When a renter did not pay for their unit for several months, she would send bills to the address on file or

call them. If she was unable to contact anyone, Haley stated, "The property becomes ours to get rid of." On March 25, 2021, Haley asked her brother to meet the police at the storage unit to cut the lock off for them because of defendant's failure to pay rent.

¶ 47                                    17. *Deputy Joe Howe*

¶ 48            Deputy Joe Howe (currently the assistant deputy director of pretrial operations for the Administrative Office of the Illinois Courts) was the chief probation officer for Tazewell County in March 2021. He was responsible for supervising the Tazewell County pretrial program, which included clients placed with GPS monitors. Howe explained clients wore a device affixed to their ankle that communicated with satellites to track their location. The location was communicated via cell service to give real-time data regarding the location of the person wearing the monitor and the status of the monitor. Data regarding the status of the monitor would include the battery life and alerts if the strap affixing the monitor was compromised in some way.

¶ 49            Howe explained clients being monitored under the Bischof protocol were subject to heightened notifications and alerts because such individuals were high-risk domestic battery defendants being kept away from specific people or locations. For these individuals, the GPS systems provided minute-by-minute tracking data as long as the device was communicating with a satellite and there was adequate cell service. The device could also be put into "pursuit mode," which would make it ping (relay data) even more frequently. Howe explained the tracking data was overlayed with Google Maps to allow for a street view or satellite view of the client's location.

¶ 50            Howe testified Cook was being monitored under the Bischof protocol in March 2021. Howe was asked to provide the tracking data from Cook's GPS monitor for March 8, 2021, from approximately 12 a.m. to 1:30 p.m. The data provided Cook's detailed location information during that time unless there was some kind of communication interruption. Howe explained that

- 11 -

a communication interruption could be caused by a specific type of building that would restrict communication signals. In his experience, it was common to have interruptions when someone with a monitor entered a "Morton Building," which is characterized by metal roofing and siding.

¶ 51　　　　　Howe was shown a document detailing the GPS data from Cook's ankle monitor on March 8, 2021, from 12 a.m. to 1:30 p.m. Howe noted the records contained an entry at 12:09:35 p.m. and the next ping occurred at 1:10:45 p.m. in the same location. Howe explained there was a communication interruption during that one-hour period. Howe noted tracking data reporting resumed at 1:10:45 p.m. and at 1:24 p.m., the GPS monitor communicated a "strap tamper alert," which meant the ankle monitor was compromised because the band was taken off or cut off. Howe stated he would receive a text message alert right away indicating there was a tamper alert on the monitor. Howe explained that even if removed, the GPS device would still communicate its location and once the alert was received, the device would shift to pursuit mode. Howe stated the report showed the device was pinging every 20 seconds or so. According to the report, the last location of the device was recorded at 1:29:46, at 6216 North Koerner Road in Edwards, Illinois. Officers were dispatched to that area.

¶ 52　　　　　　　　　　　　　　　18. *Jerry Vanderheydt*

¶ 53　　　　　Jerry Vanderheydt worked in the pretrial division of the Tazewell County Probation Department in March 2021. On March 8, 2021, he was dispatched to locate Cook's GPS monitor upon notification it had been compromised. Vanderheydt testified he arrived in the area around 6260 North Koerner Road, which was approximately the last location the monitor was detected and began searching for the monitor. At around 3:50 p.m., after approximately 30 minutes of searching, Vanderheydt found Cook's GPS monitor under some brush on the side of the road. He observed the strap had been cut. Vanderheydt stated he called his supervisor and returned the

monitor to the office. A check of the numbers on the GPS monitor Vanderheydt found confirmed it was the monitor assigned to Cook.

¶ 54                                    19. *Detective Derek Hardwood*

¶ 55         Peoria police detective Derek Hardwood was assigned to investigate the scene at defendant's storage unit on March 25, 2021. He began looking for video surveillance in particular locations relevant to the case. He found surveillance video taken on March 8, 2021, from a camera located at a Hy-Vee gas station. Still photographs from the video were admitted into evidence. Those photographs showed a silver Jeep Liberty traveling westbound on War Memorial Drive at 1:20 p.m. that day.

¶ 56                                    20. *Keia Tate and Brian Hapack*

¶ 57         Keia Tate and Brian Hapack, both employed by the Illinois State Police, testified regarding the DNA analysis in this case. Tate, a forensic scientist in the biology DNA section of the crime lab, testified she prepared the following samples for DNA analysis: (1) the samples contained in Cook's DUI kit and (2) the blood sample taken from the bloodstain on the floor of the storage unit. Brian Hapack, a forensic biology DNA analyst, testified he performed the DNA comparison of the aforementioned samples. Hapack determined the blood sample from the storage unit matched Cook's DNA profile.

¶ 58                                    21. *Detective Scott Hulse*

¶ 59         Peoria police detective Scott Hulse was assigned to the major crimes unit and was brought into the investigation of Cook's disappearance on March 25, 2021. Detective Hulse testified he was called to Northpoint Storage that day to investigate a possible crime scene. After observing the scene and the evidence found inside storage unit No. 1131 and meeting with the deputies who had been investigating Cook's disappearance, Detective Hulse determined Cook's

case would be investigated as a homicide. Detective Hulse also coordinated a search of "the area of the Kickapoo Creek all the way down to the Illinois River." He contacted the Illinois Department of Natural Resources for assistance in searching that area "to the point in which the sheriff's office had found Ms. Burns' car on March 8th." The search efforts included multiple foot searches, the use of a sonar boat, and K-9 cadaver dogs. Cook's body was not found.

¶ 60 Detective Hulse stated that, during the course of the investigation, defendant was identified as the suspect in this case based on a number of things, including the GPS monitor tracking Cook's movements. On March 8, 2021, the tracking data showed Cook traveled from Peoria to defendant's address in Chillicothe in the late morning and he then traveled through Chillicothe, ending up at Northpoint Storage, where investigators later learned defendant rented storage unit No. 1131. Detective Hulse testified he assisted in the execution of a search warrant for defendant's apartment in Chillicothe. Detective Hulse spoke with defendant's neighbor, Zmia, who provided him the photographs she took on March 8, 2021. Those photographs showed defendant and Cook were together that morning. Detective Hulse stated a spent shell casing was found in a bedroom of defendant's apartment in a "red plastic snapshot container that was an ammunition container with some marking on the top of it that were [.]380[-]caliber, essentially, handgun ammunition. It was marked on the top of the box." (On cross-examination, Detective Hulse clarified no live ammunition was found in the apartment.) He explained the shell casing found in defendant's apartment and those found in the storage unit were the same .380-caliber ammunition.

¶ 61 Detective Hulse obtained defendant's and Cook's cell phone records, which were admitted into evidence. Detective Hulse also researched Facebook records associated with Cook's Facebook account, in which he used the "vanity name Lorenzo Manuchi [*sic*]." The records

showed Cook was in contact with defendant on March 8, 2021. However, the messages defendant sent to Cook had been "unsent" by defendant at around 3:08 p.m. that day. To accomplish this, defendant had to unsend each individual message in the conversation, which, based on Detective Hulse's analysis, would have been several in a "rather lengthy conversation."

¶ 62 The Facebook records admitted into evidence showed Cook's side of the exchange with defendant on the morning of March 8, 2021. They were preserved and read: "Best in town," "Wuts ur adress," "bu got a ride back thats cool," and "jus make sure he ready." The Facebook records also showed several calls and voice messages were exchanged by defendant and Cook, but they were not captured by Facebook.

¶ 63 *22. Detective Clint Rezac*

¶ 64 Peoria police detective Clint Rezac worked in the cybercrime unit, where his job was to extract data from cell phones. Detective Rezac extracted the data from defendant's and Cook's cell phones, as well as Cook's GPS monitor. He used a mapping program called ZetX to compile the information and generate Google Earth files, which allowed investigators to quickly determine the location of mobile devices at certain times. Detective Rezac noted the GPS monitor data gave exact locations, while the cell phone data provided approximate distances of the cell phone from the cell phone tower, with an approximate location of the cell phone along an arc as indicated on the maps. Several maps generated using the software that plotted the March 8, 2021, locations of the three devices at various times were entered into evidence. Also identified in some of the photographs were the addresses where a silver Jeep was seen on surveillance videos on March 8, 2021.

¶ 65 The following is a summary of Detective Rezac's testimony based on the exhibits and the timeline of locations gleaned from the devices on March 8, 2021. At 12:51 a.m., Cook's

GPS monitor was located at his residence on Lasalle Boulevard in Marquette Heights (People's exhibit No. 73). Defendant's phone was located in the vicinity of his residence on North Second Street from 12:05 a.m. until 11:30 a.m. that day (People's exhibit Nos. 74 and 75). The data indicated that at 11:15 a.m., Cook's GPS device began traveling, pinging at numerous points on a route that ended at defendant's address at 11:31 a.m. (People's exhibit Nos. 76 to 81). At 11:30 a.m., Cook's GPS device and defendant's cell phone were shown very close together at or near defendant's residence (People's exhibit No. 82). Cook's GPS device and defendant's cell phone began traveling along a route (passing RLI Insurance Company and Busey Bank) that ended at Northpoint Storage at 11:56 a.m. (People's exhibit Nos. 83 to 89). At 12:09 p.m., Cook's GPS monitor stopped communicating data for about an hour. At 12:33 p.m., the records showed defendant's cell phone had moved several miles south, while Cook's cell phone remained in the general area of the storage facility (People's exhibit No. 91). Defendant's cell phone location began trending north again, ending up in the general area of Northpoint Storage around 1 p.m. (People's exhibit No. 92).

¶ 66    At 1:11 p.m., almost exactly one hour after the communication interruption began, Cook's GPS monitor started capturing location data again, showing the GPS monitor was at the storage facility. At this time, the GPS monitor and defendant's cell phone began traveling again, with the GPS monitor pinging along the route (including passing the Hy-Vee gas station) until 1:22 p.m., when they reached North Koerner Road. Cook's GPS device pinged several times in the same general vicinity between 1:22 and 1:28 p.m. (People's exhibit Nos. 96 to 98). At 1:30 p.m., Cook's cell phone and GPS monitor remained in the same location in the 6200 block of North Koerner Road (People's exhibit No. 99).

¶ 67 At 1:29 p.m., defendant's cell phone data showed it had traveled away from North Koerner Road (People's exhibit No. 98). At 1:37 p.m., defendant's cell phone was tracked traveling along a route that ended at the 1400 block of South Kickapoo Creek Road in Peoria at 1:59 p.m. This is the location where the Jeep was found burning (People's exhibit No. 100). Defendant's cell phone data showed he was traveling in this vicinity at 2:07 p.m., ending up farther south at 2:40 p.m. (People's exhibit Nos. 101 to 108). Defendant's cell phone data showed his location farther south and east at 2:43 p.m. and 2:49 p.m. (People's exhibit No. 109). By 3:10 p.m., defendant's phone was lingering in the general vicinity of 1315 South Laramie Street in Peoria and remained there as of 4:42 p.m.

¶ 68 23. *Detective Hulse (Redirect Examination)*

¶ 69 Detective Hulse was recalled and testified that during the time leading up to defendant's arrest, "he had been placed back on an electronic monitoring system" through the Peoria County Probation Office and provided the South Laramie address to pretrial services. When defendant was arrested, he was found, based upon the electronic monitoring system, at 1315 South Laramie Street.

¶ 70 C. Defendant's Case

¶ 71 At the close of the State's case, defendant moved for a directed verdict, arguing the evidence was insufficient even when viewed in the light most favorable to the State. Defendant's motion was denied.

¶ 72 The only evidence presented by defendant was an agreed stipulation that if recalled, Deputy Gilmore would testify he spoke with Huffman on March 9, 2021, and asked her if Cook had been feuding with anyone. The parties stipulated that Huffman said Cook had been "beefing with a lot of people ever since he snitched on someone."

¶ 73                         D. Jury's Verdict and Sentence

¶ 74        The jury found defendant guilty of both counts in the indictment: (1) first degree murder, with a finding defendant was armed with a firearm during commission of the offense, and (2) concealment of a homicidal death.

¶ 75        Defendant filed a motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial, contending (1) he was not proven guilty beyond a reasonable doubt and (2) "[he] specifically alleges as error, and incorporates by reference, as contained in the record herein, all objections made at, or prior to, trial in this matter."

¶ 76        At the hearing on the motion, defense counsel stated, "The motion pretty much solely challenges the sufficiency of the evidence. And noting the largely circumstantial nature of the case, I would incorporate by reference those arguments I made during the closing argument in this case, Judge, and ask the Court grant that motion." In response, the State contended succinctly, "The evidence of defendant's guilt was overwhelming." In denying the motion, the trial court stated, "I think overwhelming is a fair description" and pointed specifically to the cell phone data, GPS monitor data, and surveillance photographs tracking the locations of Cook and defendant.

¶ 77        Defendant was sentenced to 75 years in prison on the first degree murder conviction and 5 years on the concealment of a homicidal death conviction, to be served consecutively.

¶ 78        This appeal followed.

¶ 79                                 II. ANALYSIS

¶ 80        Defendant has raised the following three issues on appeal. First, defendant argues reversible error occurred during *voir dire* when prospective jurors were allowed to preview the evidence and law when asked whether they would require the victim's body to have been found to convict a defendant of first degree murder, and if so, whether they could disregard that belief and

- 18 -

base the verdict on the evidence. Next, defendant contends he was denied effective assistance of counsel when his attorney failed to "meaningfully challenge" the foundation for an expert's opinion testimony regarding the blood evidence in this case. Finally, defendant argues the State failed to prove him guilty beyond a reasonable doubt by failing to prove the *corpus delicti*, specifically, the fact of death, for both first degree murder and concealment of a homicidal death.

¶ 81                                          A. *Voir Dire*

¶ 82          Defendant contends he was denied a fair trial because the question asked during *voir dire* allowed the State to "preview the evidence and law" for the jury, thus "maximizing the jury's baseline receptiveness to this no-body murder prosecution." Although defendant made a contemporaneous objection to the first of two questions posed to prospective jurors, he acknowledges he failed to include this specific claim of error in his posttrial motion. Instead, defendant included a "catch-all clause" purporting to incorporate by reference all objections made during the trial. He argues, nevertheless, if this court determines the issue was not properly preserved for appeal, it should be reviewable as plain error.

¶ 83          It is well settled that to preserve an issue for appellate review, a defendant must make an objection to the purported error during the trial and raise it again in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Furthermore, "[c]atch-all arguments in post-trial motions do not preserve unspecified claims of error on appeal." (Internal quotation marks omitted.) *People v. Pace*, 225 Ill. App. 3d 415, 432 (1992). The failure to preserve an issue for appeal results in its forfeiture. *People v. Sebby*, 2017 IL 119445, ¶ 48. Consequently, we may review this claim of error only if defendant can establish plain error. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967).

¶ 84          The plain error doctrine allows a reviewing court to consider a forfeited error affecting substantial rights in two circumstances:

"(1) when a clear and obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Moon*, 2022 IL 125959, ¶ 20.

The first step in any plain error analysis is to determine whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49.

¶ 85        Criminal defendants have the constitutional right to a trial by an impartial jury. *People v. Rinehart*, 2012 IL 111719, ¶ 16; Ill. Const. 1970, art. I, § 13. *Voir dire* examination of prospective jurors permits the trial court and, when deemed proper by the trial court, the parties to ask prospective jurors questions the court "thinks appropriate, touching upon their qualifications to serve as jurors in the case at trial." Ill. S. Ct. R. 431(a) (eff. July 1, 2012). It is permissible for this inquiry to include questions directed at ascertaining whether a prospective juror has "any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried." (Internal quotation marks omitted.) *People v. Encalado*, 2018 IL 122059, ¶ 24. "The purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath." *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993).

¶ 86        "Because there is no precise test for determining which questions will filter out partial jurors [citation], the manner and scope of the examination rests within the sound discretion of the trial court." *Rinehart*, 2012 IL 111719, ¶ 16. Such decisions are reviewed for abuse of

discretion. *Id.* "An abuse of discretion occurs when the conduct of the trial court thwarts the purpose of *voir dire* examination—namely, the selection of a jury free from bias or prejudice." *Id.* A reviewing court will not find the trial court abused its discretion during *voir dire* where the questions posed and the procedures employed created a reasonable assurance any prejudice or bias would be discovered. *People v. Dow*, 240 Ill. App. 3d 392, 397 (1992).

¶ 87          Here, the trial court was presented with the unique situation where defendant was charged with first degree murder and concealment of the victim's death, but the body of the victim was not found by authorities. This precise situation was encountered in *People v. Faulkner*, 186 Ill. App. 3d 1013 (1989). In *Faulkner*, the trial court asked potential jurors during *voir dire* whether they would have difficulty following Illinois law, which does not require the State to produce the body of the victim to convict the defendant of murder. *Id.* at 1021. Two examples of the questions posed to jurors were: " 'If the Court instructs you it is not necessary for the State to produce a body in this matter to sustain a conviction, will you follow that law or instruction?' " and " 'Do you have any quarrel with the concept the State is not required to produce a body in this case?' " *Id.* at 1021-22. In affirming the trial court's decision to allow the questions, the appellate court recognized the potential for prejudice or bias, stating:

> "Although the issue of whether a suspect charged with murder can be proved
> guilty beyond a reasonable doubt where the State is unable to produce direct
> evidence of the victim's corpse may not be as commonly controverted as topics
> such as the insanity defense or the death penalty, we believe, nonetheless, that a
> prospective juror who has deep-seated preconceived notions concerning the
> necessity of direct evidence of a victim's corpse in order to sustain a guilty verdict
> presents prejudice against the State's case of a magnitude similar to that of

prejudice concerning matters such as the death penalty or an insanity defense. The focus must be on the deep-seatedness, steadfastness or immutability of the prejudice, and corresponding insurmountable burden placed on the State, rather than on the social prevalence of the controversy surrounding a given topic." *Id.* at 1025.

¶ 88 The court in *Faulker* noted that a trial's court reliance upon a general question during *voir dire*, asking potential jurors to confirm they could set aside any and all prejudices and follow the law, may be inadequate in filtering out biased jurors, particularly if those jurors have strong convictions that are, unbeknownst to them, contrary to Illinois law, which holds that *corpus delicti* may be proven by circumstantial evidence. Therefore, the court held:

"In order to effectively empanel a jury free of bias or prejudice against a State case wherein the victim's body has not been recovered, it is necessary to inquire of the potential jurors whether they possess any prejudice or bias which might preclude their finding of guilt beyond a reasonable doubt where the State is unable to produce direct evidence of the victim's body." *Id.* at 1027.

¶ 89 We agree with the sound reasoning in *Faulkner* and conclude no error occurred during *voir dire* when the trial court asked prospective jurors if they would require the victim's body be found to convict defendant of murder, and if so, whether they could disregard that belief and base their verdict on the evidence. The court acknowledged this was an "unusual" case because Cook's body was never recovered and the concern for potential bias was great, noting, "Some of the jurors might say, well, I'm not doing it, I think you do need a body, you don't have one I'm not voting guilty, period." This very concern was addressed in *Faulkner*: "Although an individual may be entitled to require direct proof before believing matters outside the courtroom, and in no

- 22 -

instance settling for proof by circumstantial evidence, such an individual is not capable of being an impartial fact finder in an Illinois court conducting a trial where circumstantial evidence is presented." *Id.*

¶ 90　　　　Defendant asks this court to disregard *Faulkner* and instead relies on *Encalado*, 2018 IL 122059, ¶¶ 26-27, to argue:

> "Conjecture that the evidence to be introduced at trial may 'evoke "strong responses" ' does not open the door to *voir dire* examination on the prospective jurors' uninstructed thoughts on such evidence; rather, there must be some concrete basis from which to conclude that the prospective jurors will not be able to 'fairly consider' the evidence when the time comes."

We find defendant's argument unpersuasive.

¶ 91　　　　In *Encalado*, the defendant was charged with numerous sex offenses and stated he intended to testify that the alleged victim and other witnesses consented to having sex with him in exchange for money and drugs. *Id.* ¶¶ 5-7. As such, the defendant asked the trial court to inquire of the venire if evidence he had engaged in soliciting and using prostitutes would influence the prospective jurors' judgment in any way. *Id.* ¶ 7. The trial court denied defendant's request (*id.*), but the appellate court reversed, finding the defendant's trial was fundamentally unfair because the jurors were not asked about any potential biases regarding prostitution. *Id.* ¶ 21. The appellate court "observed that various courts have noted that certain sexual behaviors, including prostitution, can evoke 'strong responses.' " *Id.* ¶ 26. The appellate court concluded that because the jury was going to hear evidence the defendant patronized prostitutes, the potential jurors should have been asked if they held any bias in that regard. *Id.* In doing so, the court relied upon *People v. Strain*, 194 Ill. 2d 467 (2000), *Encalado*, 2018 IL 122059, ¶ 26.

¶ 92         In *Strain*, the State's theory of the case was the defendant, an admitted former gang member charged with first degree murder, shot an innocent bystander during an attempted retaliation for a gang-related shooting. *Strain*, 194 Ill. 2d at 469-73. The supreme court held that when testimony regarding gang membership and activity will be an integral part of a trial, a defendant must be allowed to question prospective jurors concerning gang bias. *Id.* at 477.

¶ 93         In reversing the appellate court's decision in *Encalado*, the supreme court distinguished *Strain*, explaining the *voir dire* questions regarding gang bias were necessary because it is well established that "the public views the testimony of gang members with skepticism and may, therefore, fail to consider the testimony of a gang member without prejudice" (*Encalado*, 2018 IL 122059, ¶ 30); however, in the case of prostitution, "none of the authorities establish that the public harbors bias against the patrons of prostitutes to the extent that such a person's testimony cannot be considered fairly" (*id.* ¶ 31). The *Encalado* court further distinguished *Strain*, noting the majority of the witnesses who would be testifying at trial in that case were gang members, and thus, gang affiliation was a matter both "inescapably a part of the trial and a matter that was not in dispute by either party." *Id.* ¶ 32. In contrast, it was disputed in *Encalado* whether two of the witnesses were, in fact, prostitutes; therefore, defendant's proffered question "amounted to a preliminary argument regarding a disputed question of fact," a type of question not permitted during *voir dire*. *Id.* ¶ 33. Thus, the supreme court concluded in *Encalado* that the trial court did not abuse its discretion in denying defendant's request to question the venire regarding potential bias related to prostitution.

¶ 94         Relying on *Encalado*, defendant argues "the record is devoid of authority suggesting that the public harbors such bias against the state in a no-body murder case that the jury could not fairly consider circumstantial evidence of death." We find this argument lacking for

several reasons. First, the very fact this case presents an extremely unique circumstance (one the trial court acknowledged, stating, "I've done 118 felony jury trials and I've never done a murder where the body was not found.") provides an explanation for the lack of authority on the issue. Further, the potential bias prospective jurors may hold against a defendant for his association with prostitutes is clearly distinguishable from the potential bias against the State for not producing the body of a victim in a murder case. The former involves a potential bias against a defendant for his own personal conduct, and the latter involves a potential bias based upon what could be a common misapprehension of the law and outside the State's control. Finally, and consistent with the reasoning in *Strain*, the fact that the victim's body was not found in this case is an integral part of the trial and not in dispute. Thus, we find *Encalado* distinguishable.

¶ 95        Likewise, we reject defendant's argument that *Faulkner*, a case directly addressing the issue in this case, should not be followed. See also *Rinehart*, 2012 IL 111719, ¶ 17 (acknowledging the holding in *Faulkner* as "the State may inquire whether venire members have deep-seated beliefs that prevent them from returning a guilty verdict in a murder case where the State cannot produce direct evidence of the victim's body"). We find, as the court did in *Faulkner*, a general question during *voir dire*, asking potential jurors whether they could set aside any and all prejudices and follow the law, would be inadequate to filter out a biased juror, particularly if that juror has a strong conviction that a body must be found to convict a defendant of murder which is, unbeknownst to them, contrary to Illinois law. Therefore, we conclude the questions posed during *voir dire* regarding the prospective jurors' potential bias in this no-body murder case created a reasonable assurance any prejudice or bias would be discovered; thus, no abuse of discretion occurred. Because we find no error occurred, there can be no plain error. See *People v. Hood*, 2016 IL 118581, ¶¶ 18, 29 (stating there can be no plain error without a finding of error).

B. Ineffective Assistance of Counsel

¶ 97        Defendant argues his trial counsel provided ineffective assistance by failing to "meaningfully challenge" the foundation for Dr. Youmans's expert opinion. He contends Dr. Youmans was qualified as an expert in the field of forensic pathology, not as an expert in "bloodstain pattern analysis."; Thus, his trial counsel should have challenged the basis for her opinion that the amount of blood found in the storage unit could have been from a person sustaining a serious penetrating injury resulting in death at the scene or requiring immediate medical attention to prevent the loss of life. Defendant argues his counsel's failure to do so denied him a fair trial.

¶ 98        All criminal defendants have the constitutional right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. A claim of ineffective assistance of counsel is evaluated under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29. Under the *Strickland* test, a defendant must establish (1) counsel's performance was deficient, meaning "counsel's performance fell below an objective standard of reasonableness," and (2) defendant was prejudiced, meaning "a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *People v. Hayes*, 2022 IL App (4th) 210409, ¶ 51. Failure to establish either prong of the test precludes a finding of ineffective assistance of counsel. *Id.* When a claim of ineffective assistance of counsel is not raised at the trial court level, the matter is reviewed by this court *de novo*. *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 85.

¶ 99        The opinion testimony of an expert witness must be based on facts or data reasonably relied upon by experts in that particular field. *People v. Petrie*, 2021 IL App (2d) 190213, ¶ 68. Illinois Rule of Evidence 705 (eff. Jan. 1, 2011) provides, "The expert may testify

in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise." In such instances, the burden shifts to the opposing party to explore the underlying facts or data through rigorous cross-examination. *People v. Murray*, 2019 IL 123289, ¶ 33. "However, the burden remains on the State to prove all the elements of the offense, which may include the burden of laying a proper foundation for the admission of an expert opinion relevant to one of those elements." *Petrie*, 2021 Il App (2d) 190213, ¶ 69.

¶ 100    The decision of whether and how to conduct a cross-examination of a witness is generally a matter of trial strategy and will not support a claim of ineffective assistance of counsel. *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 62. "To prove otherwise, a party must show that counsel's conduct was 'so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy.' " *Petrie*, 2021 IL App (2d) 190213, ¶ 66 (quoting *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82). Decisions regarding the manner in which to cross-examine a particular witness involve the exercise of professional judgment, which is entitled to substantial deference. A defendant can only prevail on an ineffectiveness claim by showing counsel's approach to cross-examination was objectively unreasonable. *People v. Pecoraro*, 175 Ill. 2d 294, 327 (1997).

¶ 101    The record reveals Dr. Youmans's expert testimony was very brief and focused exclusively on her opinion about the "requirement for medical attention" based on the amount of blood visible in the photographs of the storage unit. Dr. Youmans stated her opinion as follows: "Based upon the amount of blood that I see in the photographs, I could say that a person sustained a serious penetrating injury that could have either resulted in death at the scene. If not death, they would need immediate medical attention to prevent loss of life." Given the brevity of the State's

examination and limited basis for Dr. Youmans's opinion, it was sound trial strategy for defendant's trial counsel to similarly limit his cross-examination of this expert. Trial counsel conducted a meaningful challenge to Dr. Youmans's testimony by focusing on the singular basis of her opinion—confirming she did not personally visit the scene or take any physical measurements of the bloodstains but, rather based her opinion exclusively on viewing photographs of the scene. Defense counsel may have strategized that any additional questions, such as those posited in defendant's brief, may very well have given Dr. Youmans the opportunity to expand on and strengthen the limited opinion she had already given on direct examination about what the amount of blood at the scene "could have" resulted in death at the scene or required the need for immediate medical attention to save the person's life. We conclude, therefore, defendant was not denied effective assistance of counsel because trial counsel's decisions were neither irrational nor unreasonable but were the product of reasonable trial strategy. See *Hayes*, 2022 IL App (4th) 210409, ¶ 51 (stating the ineffective assistance of counsel claim may be resolved on lack of deficient performance alone).

¶ 102                    C. Proof of the *Corpus Delicti* Beyond a Reasonable Doubt

¶ 103          Defendant's final claim of error is the State failed to prove beyond a reasonable doubt the *corpus delicti* for murder and concealment of a homicidal death. Defendant contends the State's evidence of "the fact of death" was limited to the testimony of witnesses that Cook abruptly dropped out of contact with them, Dr. Youmans's testimony that the blood in the storage unit showed an amount of blood loss that would have been fatal absent immediate medical attention, and the testimony of certain recordkeepers that defendant never received medical services at their facilities on March 8, 2021, or within a number of weeks thereafter. Defendant contends this

evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt about his guilt on both offenses. After our careful review, we disagree.

¶ 104        "Proof of an offense requires proof of two concepts: first, that a crime occurred, or the *corpus delicti*, and second, that it was committed by the person charged." *People v. Ehlert*, 211 Ill. 2d 192, 202 (2004). In this case, defendant was convicted of the first degree murder of Cook and the concealment of his death. The *corpus delicti* of any criminal homicide consists of the fact of death and the fact that death was produced by the criminal agency of another. *People v. Milner*, 123 Ill. App. 3d 656, 662 (1984). Proof of the *corpus delicti* may be made by circumstantial evidence. *People v. Gendron*, 41 Ill. 2d 351, 360 (1968); *People v. Crawford*, 93 Ill. App. 3d 510, 514 (1981).

¶ 105        When faced with a challenge to the sufficiency of the evidence in a criminal case, a reviewing court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *People v. Baskerville*, 2012 IL 111056, ¶ 31. This standard of review applies in all criminal cases, whether the evidence is direct or circumstantial. *Ehlert*, 211 Ill. 2d at 202. "All reasonable inferences from the evidence must be drawn in favor of the prosecution." *People v. Hardman*, 2017 IL 121453, ¶ 37. Reversal of a conviction is not warranted "unless the evidence is so unreasonable, improbable, or so unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Gray*, 2017 IL 120958, ¶ 35.

¶ 106        Although Cook's body was not recovered, the evidence presented at trial and the inferences drawn therefrom provided a detailed timeline supporting the conclusion that he died on March 8, 2021, in storage unit No. 1131 at Northpoint Storage. Cook's movements that day were tracked by the GPS monitor affixed to his ankle until approximately 1:24 p.m., when the GPS

monitor was cut from his ankle and remained in an area around 6260 North Koerner Road, where it was found under some brush at around 3:50 p.m. Cook's movements, as recorded by the GPS monitor and cell phone records, showed that Cook drove his aunt's silver Jeep to defendant's apartment, where, at around 11:30 a.m., he and defendant loaded a red motorbike into the Jeep. The two then drove to Northpoint Storage. The red motorbike was later found inside storage unit No. 1131, which was rented by defendant. Upon arriving at the storage unit, Cook's GPS monitor stopped communicating for an hour, likely because it was inside the metal building, which is known to cause a disruption of the signal. During that hour, defendant left the storage facility and returned, at which time Cook's GPS monitor began tracking him again along a driving route until 1:24 p.m., when the GSP monitor was removed from Cook's ankle, separated from him, and remained in the area near 6260 North Koerner Road until it was later recovered by Vanderheydt. On March 25, 2021, during a search of storage unit No. 1131, police found multiple bloodstains on the floor. The large bloodstain was proven to be Cook's blood. Dr. Youmans opined that, based on her review of photographs of that bloodstain, the amount of blood at the scene could have resulted from a serious penetrating injury, which could have caused death at the scene or the need for immediate medical attention to save the person's life. Shell casing and projectiles found in the storage unit and another shell casing found in defendant's apartment were determined to have been fired from the same firearm.

¶ 107     Further circumstantial evidence that Cook was no longer living after March 8, 2021, was the fact that his whereabouts after that date were unknown. Cook was reported as missing to the Peoria police on March 8, 2021, and a missing person case was opened. The vehicle Cook had been driving that day was found burning in a creek bed in the vicinity of where Cook's and defendant's locations had been tracked. Pogioli, the mother of Cook's young daughter, testified

she maintained regular contact with him and he would speak to his daughter on the phone or video chat with her every week or so. He would never go months without speaking to his daughter. Huffman, who had been in a five-year relationship with Cook at the time, testified she had contact with him "[e]very day pretty much" and the longest she would go without seeing him was a day or two. Bianchi, Cook's cousin, testified she saw Cook every weekday at her mother's house and spoke to him nearly every day about caring for her mother. Pogioli, Huffman, and Bianchi all testified they had not seen or heard from Cook since March 8, 2021. The recordkeepers from two local hospital systems (Unity Point and OSF St. Francis Medical Center) testified Cook had not received treatment at any of their hospitals or treatment facilities on March 8, 2021, or in a number of weeks thereafter.

¶ 108        After reviewing the evidence in the light most favorable to the State, we conclude any rational trier of fact could have found the State proved the *corpus delicti* for murder and concealment of a homicidal death beyond a reasonable doubt. The GPS tracking records, cell phone locations, photographs from surveillance cameras along the routes Cook and defendant traveled that day, photographs of the crime scene, testimony of Dr. Youmans, the disposal of Cook's vehicle, and the fact that people close to Cook had not heard from him since March 8, 2021, prove the fact of Cook's death that day beyond a reasonable doubt. Therefore, we affirm defendant's conviction for murder and the concealment of a homicidal death.

¶ 109                               III. CONCLUSION

¶ 110        For the reasons stated, we affirm the trial court's judgment.

¶ 111        Affirmed.